**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION AT CLEVELAND**

| | |
|---|---|
| John Doe 1,[1]                 ) | |
|                             ) | |
|         Plaintiff,        ) | |
|                             ) | |
| v.                           ) | |

John Doe 1,[1]

        Plaintiff,

v.

Varsity Brands, LLC, Varsity Spirit, LLC,
Varsity Brands Holding Company, Inc.,
U.S. All Star Federation, Inc. d/b/a U.S.
All Star Federation, USA Federation
for Sport Cheering d/b/a USA Cheer,
Charlesbank Capital Partners, LP, Bain
Capital, LP, Jeff Webb, individually,
Taji Davis, Brandon Hale, and ShowPro
Choreography,

        Defendants.

**COMPLAINT
(JURY DEMAND)**

Plaintiff files this complaint by and through undersigned counsel of record against the above-named Defendants for money damages in connection with conduct: (1) in violation of the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, 18 U.S.C. §2255; (2) constituting a civil conspiracy in violation of the Racketeer Influenced and Corrupt Organization (RICO) Act, Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §1962(c) and (3) giving rise to common law claims of gross negligence, negligent supervision, and assault/battery; and (4) constituting violations of contractual and/or equitable responsibilities owed to Plaintiff.  As a direct and proximate result of Defendants' collective and individual conduct, Plaintiff sustained and will continue to sustain actual and ongoing injuries and damages, and in support thereof, he alleges as follows:

---

[1]     Given the nature of the subject matter as well as the potential for harm that exists against those who come forward to inform against Defendants, the Plaintiff in this matter will be identified only as John Doe in conjunction with the factual underpinnings on this complaint.

## **INTRODUCTION**

1.      Beginning in or around the summer of 2014, Plaintiff John Doe 1 was an All-Star athlete cheering on behalf of a private U.S. All-star Federation – Cheer & Dance (USASF) member gym in Avon Lake, Ohio. Around the same timeframe, Plaintiff John Doe 1's All-star gym periodically contracted with Defendant Brandon Hale, Defendant Taji Davis, and Defendant ShowPro Choreography to provide choreography services for the gym.

2.      For days during these choreography sessions, Defendants Hale, Davis, and ShowPro would have unfettered access to minor athletes, such as Plaintiff John Doe 1, engaging with these minors on an intimate level and forming bonds with these minor athletes.

3.      In addition to providing choreography services, at all times relevant to this complaint, Defendants Brandon Hale and Taji Davis were also credentialed USASF coaches and/or members, with the authority and ability to appear at USASF member gyms, and to attend USASF sanctioned events.

4.      As set forth more fully herein, beginning in 2014, and by virtue of the positions of trust and authority granted to them, Defendant Hale and Defendant Davis, individually and in the course and scope of their role with Defendant ShowPro Choreography, systematically groomed and sexually abused Plaintiff John Doe 1.

5.      Though initially scared to come forward following this abuse, Plaintiff John Doe 1 ultimately reported the abuse to Defendant USASF by and through USAF's authorized representatives. However, not only did Defendant USASF refuse to support Plaintiff John Doe 1, but also—despite having notice of abuse against Plaintiff John Doe 1-- Defendant USASF has never permanently suspended Defendants Hale, Davis, or ShowPro Choreography from continuing to access Defendant USASF member minor athletes.

6.      During the relevant timeframe, as certified members and authorized vendors, Defendants Brandon Hale, Taji Davis, and ShowPro Choreography worked in a consortium with Defendants Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, (collectively "the Varsity Defendants") and the Varsity Defendants' owners and affiliates, including Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation ("Defendant USASF"), Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer"), Defendant Bain Capital, Defendant Charlesbank, and Defendant Jeff Webb to expand the Varsity Defendants' network of minor athletes and prop up the Varsity Defendants' billion-dollar business.

7.      During the relevant timeframe, and upon information and belief, Defendants Brandon Hale, Taji Davis, and ShowPro Choreography were part of a network of coaches, choreographers, affiliates, and vendors empowered and placed in positions of trust and authority by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Webb, Defendant Bain Capital, and Defendant Charlesbank.

8.      At the same time, and upon information and belief, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Webb, Defendant Charlesbank, and Defendant Bain knew or had reason to know Defendant Hale, Defendant Davis, and Defendant ShowPro Choreography had engaged in significant misconduct and abuse involving USASF minor athletes.

9.      Upon information and belief, the scheme to anoint specific coaches, choreographers, and vendors at the expense of best safety practices occurred as the Varsity Defendants were creating and expanding a business model reliant upon a pipeline of young

3

athletes, each of whom was a participant of a member gym, and each of whom represented a significant contribution to the Varsity Defendants' business worth billions of dollars.

10.     As set forth in this complaint, the Defendants, together and individually have knowingly, or with a reckless disregard, created, organized, and propagated a system of young-athlete abuse against innocent victims including Plaintiff John Doe 1.

11.     This is a complaint for legal and equitable relief for the victims of this scheme.

## JURISDICTION, PARTIES, AND VENUE

12.     This action arises pursuant to, and involves questions requiring the interpretation of the laws of the United States and thus subject matter jurisdiction is conferred upon the Court by 28 U.S.C. §1331.

13.     Supplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. §1367(a).

14.     Currently, Plaintiff John Doe 1 has been a citizen and resident of New York. During the operative timeframe of this complaint, Plaintiff John Doe 1 was a citizen and resident of Ohio, in Lorain County.

15.     At all times relevant to this complaint, Defendant ShowPro Choreography n/k/a Showtyme Productions ("Defendant ShowPro") was a choreography company with a principal place of business in High Point, North Carolina. At all times relevant to this complaint, Defendant ShowPro was an authorized USASF vendor, and, by and through its employees, owners, agents, and authorized representatives, all within the course and scope of their responsibilities, did interact on a daily basis with minor children, at various USASF member gyms, camps, clinics, and competitions throughout the country.

16.     Upon information and belief, at all times relevant to this complaint, Defendant Taji Davis ("Defendant Davis") was a USASF credentialed member coach and choreographer providing services to USASF member minor athletes throughout the United States including on behalf of gyms in Avon Lake, Ohio, and Brecksville, Ohio. As an authorized USASF member, Defendant Davis was empowered and is still empowered to access USASF member minor athletes including Plaintiff John Doe 1.  As of today, Defendant Davis is a citizen and resident of Houston, Texas.

17.     Upon information and belief, and at all times relevant to this complaint, Defendant Brandon Hale ("Defendant Hale") was a USASF credentialed member coach and choreographer providing services to USASF member minor athletes throughout the United States including on behalf of gyms in Avon Lake, Ohio. As an authorized USASF member, Defendant Hale was empowered and is still empowered to access USASF member minor athletes including Plaintiff John Doe 1. As of today, Defendant Hale is a citizen and resident of North Carolina.

18.     At all times relevant to this complaint, Defendant Jeff Webb ("Defendant Webb") was a citizen of Memphis, Tennessee, and created, owned, operated, and controlled Defendant Varsity Brands, LLC, Defendant Varsity Spirit, LLC, Defendant Varsity Brands Holding Company, Inc., Defendant USASF, and Defendant USA Cheer, all of which did business throughout the United States.

19.     At all times relevant to this complaint, Defendant Varsity Brands, LLC (f/k/a Varsity Brands, Inc.) ("Defendant Varsity Brands") has been a for-profit entity organized under the laws of Delaware with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation).

5

20.     At all times relevant to this complaint, Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation) ("Defendant Varsity Spirit") has been a for-profit entity organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee. As set forth more fully herein, during the operative timeframe, Defendant Varsity Spirit has been the world's largest purveyor of merchandise, branding, camps, clinics, and competitions for the private All-star cheer industry, encompassing as much as 90% of the industry's gyms, coaches, vendors, and athletes.

21.     At all times relevant to this complaint, Defendant Varsity Brands Holding Company, Inc. ("Defendant Varsity Brands Holding") has been a for-profit entity organized under the laws of Texas with its principal place of business in Farmers Branch in Dallas County, Texas.

22.     Throughout this complaint, Defendants Varsity Spirit, LLC, Varsity Brands, LLC and Varsity Brands Holding Company, Inc., shall be referred to as the "Varsity Defendants". At all times relevant to this Complaint, either directly or through affiliates, including those wholly owned and/or controlled, the Varsity Defendants organized, promoted, produced, and/or managed merchandise, branding, cheer camps, and competitions throughout the United States including Ohio.

23.     At all times relevant to this complaint, Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation (hereinafter "Defendant USASF") has been a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee, and the self-proclaimed governing and regulatory body promulgating and enforcing rules for private All-star cheer. As set forth more fully in this complaint, during the operative timeframe, Defendant USASF was aware of the allegations of abuse against Defendant John Doe 1, and was responsible for investigating and ultimately protecting the interests of Plaintiff John Doe 1, yet, upon information and belief

6

willfully failed to do so. At all times relevant hereto, Defendant USASF has been controlled and funded by the Varsity Defendants.

24.     At all times relevant to this Complaint, Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer") has been a non-profit entity organized and existing in the state of Texas, and the governing body for sport cheering throughout the United States. Defendant USA Cheer is controlled and funded by the Varsity Defendants as described further herein.

25.     At all times relevant to this Complaint, the Varsity Defendants and Defendants USASF and USA Cheer either directly and/or through their affiliates, which they control, have: (a) promulgated and/or enforced rules governing competitive cheer coaching, competitive cheer training, cheer camps and competitions throughout the United States; (b) organized, promoted, produced, and/or managed cheer camps, clinics, and competitions throughout the United States and furthered the goals and purposes of the conspiracy and conduct set forth herein; (c) established guidelines and assessed whether to certify gyms, coaches, and vendors, including without limitation those named herein, as members of USASF and/or USA Cheer, and to otherwise provide "credentials" for these coaches, vendors, and affiliates; and (d) required that athletes, coaches, vendors purchase annual memberships with Defendant USASF and in order to participate in the Varsity Defendants' sanctioned events, and to access USASF member minor athletes.

26.     At all times relevant to this complaint, Defendant Charlesbank Capital Partners, LP (hereinafter "Defendant Charlesbank") has been a for-profit entity organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts. As set forth herein, and during the relevant timeframe, Defendant Charlesbank has been a minority and/or majority owner of the Varsity Defendants.

7

27.     At all times relevant to this complaint, Defendant Bain Capital, LP (hereinafter "Defendant Bain Capital") has been a for-profit entity organized under the laws of Massachusetts, with its principal place of business in Boston, Suffolk County, Massachusetts. Since 2018, Defendant Bain Capital has been the majority owner of the Varsity Defendants.

28.     This Court has jurisdiction over this case because the abuse described herein occurred in Cuyahoga County, Ohio and, at all relevant times, Defendants were present in, and/or doing business in Cuyahoga County, Ohio, and were availing themselves of the rights and responsibilities of the laws of Ohio.

29.     Venue is proper in this Court because the events giving rise to this lawsuit occurred in Cuyahoga County, Ohio.

## TIMELY FILING

30.     As set forth herein, this complaint alleges causes of action arising under and out of assault and battery perpetrated against Plaintiff John Doe 1 while he was a minor under eighteen years of age, and by adults who were agents, employees, and/or authorized representatives of the Defendants, and/or over whom Defendants, including the Varsity Defendants exercised a significant degree of control.

31.     As it relates to the conduct alleged in this complaint, Plaintiff had no opportunity to know of the accruing harm perpetrated by all of the Defendants, including the Varsity Defendants, Defendant Webb, Defendant USASF, and Defendant USA Cheer, including Defendants' failures to abide by internal policies and procedures related to sexual abuse and misconduct, failing to make or follow through with mandatory reports, failing to undertake appropriate investigations, rubber stamping investigations to as to ensure that Plaintiff's

complaints were unresolved, and failing to enforce and institute rigorous rules against sexual abuse of minor athletes within the Varsity Defendants' network.

32.     Upon information and belief, Defendants took efforts to conceal their failures, or acted with reckless disregard related to timely, effective, appropriate investigation, reporting, follow up and governance, and to generally protect vulnerable athletes including Plaintiff John Doe 1. Defendants' actions made it impossible to know the danger presented, or that Defendants could have prevented that danger.

33.     As such, Plaintiff John Doe 1's claims are timely by virtue of arising out of assault and battery that occurred while Plaintiff was a minor under the age of eighteen, as well as through equitable tolling based upon Defendants' conduct in concealing violations of or operating with a reckless disregard toward Plaintiff John Doe 1's rights.

## FACTUAL ALLEGATIONS

### I.     The Competitive Cheer World

34.     Private All-star cheer is a competitive and dynamic sport where athletes compete in a team setting, mixing a variety of disciplines including cheer, dance, and tumble.

35.     In contrast to traditional sideline cheer, where athletes are generally a compliment to another sport, such as football or basketball, All-star competitive cheer is a focus unto itself.

36.     Because of its unregulated nature, All-star cheer is not subject to traditional seasonal limitations, or other restrictions against year-round performance and training.

37.     As such, All-star cheer requires an extreme amount of commitment from athletes and their families, with near constant training, cross-training, and frequent competition travel through multiple seasons throughout the year.

38.     This level of dedication is costly. A single season can, at minimum, cost between $3,000 to $7,000 per team member. Some families spend $20,000 or more for transportation, lodging, membership and entrance fees, as well as merchandise, uniforms, and other accessories and incidentals, incurred in connection with the numerous competitions the athletes attend throughout the year.

39.     In this space of All-star cheer, the Varsity Defendants have emerged as the pre-eminent business.

40.     In 1971, Defendant Jeff Webb began his work in cheerleading as an employee at the National Cheerleaders Association working for Lawrence Herkimer, known as the original pioneer of cheer.

41.     During his work with Herkimer, Defendant Webb familiarized himself and began forming a plan to monetize the operation of cheerleading "camps" – days-long events where athletes would converge to learn new skills.

42.     In 1974, Defendant Webb left Herkimer and formed his own group, which he similarly named the Universal Cheerleaders Association. By and through Universal Cheerleaders Association, Defendant Webb grew his footprint in the cheer industry, promoting and showcasing his cheer camps, which grew throughout the 1980s.

43.     During the 1980s, Defendant Webb's cheer camp organization transformed into Varsity Spirit.

44.     As with Herkimer's association, Varsity Spirit began as a provider of cheer camps.

45.     Defendant Varsity Spirit, LLC thereafter expanded into competitions, merchandising, branding, social media, and even gym ownership and management.

46.     By the early 2000's, Varsity Brands, Inc. publicly represented itself as:

10

    a.   The largest designer, marketer, and supplier of cheerleader dance team uniforms and accessories;

    b.   The biggest operator of cheerleading and dance team training camps and clinics;

    c.   A leading organizer of special events for extracurricular activities;

    d.   A major provider of studio dance conventions and competitions; and

    e.   A producer of studio dance apparent for studio dance competitions.[2]

47.    As early as 2002, the largest source of revenue for Varsity Brands, Inc. came from its connection with All-star cheer.

48.    Through their various dealings in the cheer industry, at all times relevant to this complaint, and upon information and belief, the Varsity Defendants have controlled an estimated 80-90% of the market.

49.    As of today, and as set forth more fully herein, a substantial portion of the revenue from each individual athlete who cheers for a Varsity affiliate goes directly to the Varsity Defendants.

50.    These fees frequently include music and choreography fees, and, as such and upon information and belief, the Varsity Defendants expanded their network to include choreographers, such as Defendant ShowPro, as well as coaches who provided certain skills training and choreography services, including Defendants Hale and Davis.

51.    The total competitive cheer industry is estimated to include as many as four million athletes throughout the United States, and is further estimated to generate billions of dollars of revenue annually.

---

[2]   *See* Varsity Brands, Inc., Form 10-K, (Apr. 1, 2002), available at: https://www.sec.gov/Archives/edgar/data/874786/000093041302001124/c23854_10k.txt

52.     For instance, in or around 2021, Bain Capital reported Defendant Varsity Spirit's annual earnings exceeded $1.3 billion.

53.     A huge source of revenue in the All-star world are the cheer camps, clinics, and competitions held locally, regionally, nationally, and even worldwide. These events frequently require athletes to travel across state lines, and to incur music and choreography fees.

54.     Today, these events are hosted and conducted under the guidance, certification, and rulemaking of a group of entities created, controlled, and funded by the Varsity Defendants.

55.     Specifically, in or around 2003, and in response to the formation of the National All-Star Cheerleading Coaches Congress ("NACCC"), Defendant Webb and the Varsity Defendants founded Defendant USASF to provide governance and regulatory support for the All-star cheer world.

56.     After forming Defendant USASF, Defendant Webb mandated that All-star athletes cheering on behalf of Varsity-affiliated gyms purchase a USASF membership as a requirement to compete at Varsity-sponsored events. Moreover, gyms and coaches who wished to compete at and attend Varsity-sponsored events were also required to become members of USASF.

57.     At the same time, in or around 2006, the Varsity Defendants promoted certain all-star member clubs and coaches as being "USASF Certified," a seal that Defendants represented was synonymous with a warranty that a gym, a coach, a choreographer, and any adult certified by USASF was held to the highest standards, and followed best safety practices, including to prevent athlete abuse.[3]

---

[3]     For instance, as it relates to USASF's "greenlight determination," USASF represents that "[b]ackground checks are a critical component of any athlete protection program. At USASF, we believe thorough a [sic] background check of all individuals who engage in regular contact with minor athletes is the first step toward protecting those athletes." *See* USASF Directory FAQs for 2022-2023, available at: USASF Member Directory.

58.     Moreover, and upon information and belief, this credentialing served as a signal to parents and athletes that USASF would continually monitor and ensure compliance by its member gyms, coaches, vendors, and other affiliates.

59.     Upon information and belief, the Varsity Defendants require gyms to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity Spirit, LLC for buying merchandise, participating in events, and working alongside Varsity-approved vendors.

60.     The Varsity Defendants control every aspect of cheerleading at every level in the United States. The Varsity Defendants even own several gyms and cheer programs, many of which were failing or mismanaged before Varsity's takeover.

61.     All-star athletes competing on behalf of Varsity-member gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for music, training, competition attendance, uniforms, accessories, and other related fees.

62.     Coaches and vendors likewise pay monthly or annual fees to USASF, USA Cheer, and the Varsity Defendants, including to continue on as approved vendors within the Varsity Defendants' network.

63.     The Varsity Defendants and their certified gyms encourage members to pay these fees, dues, and other expenses via auto-draft or credit card.

64.     Athletes who compete on behalf of a Varsity-affiliated gym are precluded from transferring from one Varsity-affiliated gym to another without permission. This restriction in the athlete's ability to select a gym of their choice after initially agreeing to cheer for a Varsity-gym inhibits athletes from reporting misconduct.

65.     To this day, Defendant Webb remains intimately involved and interested in the ongoing affairs of the Varsity Defendants. Jackie Kennedy, Varsity Spirit's VP of marketing, said

13

of Defendant Webb in January of 2019, "Jeff is still teaching and leading camps alongside our summer camp instructors. His passion permeates into all of the people here at Varsity Spirit, and Jeff cares about every single employee. He takes the time to meet every new employee. He learns their name, where they are from and what they are passionate about."

66.     At all times relevant to this complaint, and by virtue of the closed network they created, the Varsity Defendants obtained access to minor USASF members, including John Doe 1, marketing to them that participation with a USASF Certified gym would provide the athlete with access to the highest echelon competitions in the sport under strict safety standards.[4]

67.     Meanwhile, membership in USASF, and with a Varsity-affiliated gym mandates competing in a specified number of annual Varsity events, and under circumstances, and around adults who were specifically curated by the Varsity Defendants, and Defendants USASF and USA Cheer.

68.     When attending Varsity events, members and their families are required to purchase rooms at a designated Varsity-chosen hotel at reportedly inflated prices. Varsity dubs this system "stay-to-play." Upon information and belief, failure by an athlete to adhere to "stay-to-play" could subject the entire team to disqualification.

69.     In addition to traveling to Varsity events, minor member athletes, such as Plaintiff John Doe 1, are also required to participate in certain cheer camps and clinics, whereby USASF approved vendors, such as Defendants Davis, Hale, and ShowPro, are granted access to the minor member athletes for several days to teach certain cheer skills, stunts, and tumbling.

---

[4]      *See* "Sanctioned Competitions," USASF available at: <u>Sanctioned Competitions - Cheer & Dance | USASF</u> ("When All Star clubs attend USASF Sanctioned Competitions, they can be assured their athletes, coaches, and parents are attending events that comply with the sport's best safety practices.").

70.     During these camps and clinics and thereafter, Defendants know, or it is foreseeable that, the USASF member coaches and choreographers who obtain access to the USASF minor members athletes will continue to follow or otherwise interact with these minors including through social media and other electronic means.

71.     Some of these camps and clinics require minor athletes to travel to pre-selected locations.

72.     Further, at all times relevant to this complaint, the Varsity Defendants and Defendant USASF know or it foreseeable that the USASF adult member coaches and choreographers, who are often marketed in advance of the camps and clinics to boost minor athlete attendance, will be traveling across state lines to attend the camps or clinics.

73.     At each of the camps and clinics, it is therefore foreseeable that the USASF approved adults will co-mingle with the minor athletes including during the camps and clinics, and after hours.

74.     Moreover, and at all times relevant to this complaint, at these events, camps, and clinics, the Varsity Defendants and Defendant USASF know or have reason to know that minor athletes are being exposed to drugs and alcohol.

75.     Upon information and belief, once athletes join Varsity-affiliated, USASF All-Star cheer gyms, coaches and other gym staff begin suggesting one-on-one coaching time, closed choreography time, or participation in skills clinics and camps where the parent is not allowed to attend.  Athletes are told this level of intensive training is necessary to rise to the next level, compete in higher divisions, win prestige and celebrity status that will enable the athlete to cheer at the collegiate level, and possibly become coaches themselves one day. This system of promoting intensive one-on-one time with the athletes gives coaches, choreographers, and other USASF

15

approved vendors increased access to young and impressionable athletes and corresponds to the Varsity Defendants' system of camps and competitions, creating further generations of Varsity coaches and Varsity-backed gyms.

76.     To encourage even greater athlete participation, the Varsity Defendants, in conjunction with their member gyms, coaches, and vendors, in 2011 created "Cheerlebrity," whereby the Varsity Defendants used their online, social media, and significant industry influence to promote coaches, vendors, athletes and gyms.

77.     "Cheerlebrity" became the impetus behind the Netflix show "Cheer" that propelled Jerry Harris to fame.

78.     "Cheerlebrity" was a competition created by the Varsity Defendants in the image of *American Idol* which sought to promote Varsity All-star gyms and cheerleaders through social media presence.

79.     Upon information and belief, "Cheerlebrity" is one example of marketing and branding that catered specifically to young athletes and was intended to increase young athlete participation and desire to participate in the industry.

80.     Upon information and belief, Defendants Davis, Hale, and ShowPro were well-known in the Varsity Spirit, LLC community, enjoying status and promotion on the Varsity Defendants' marketing and branding content, including, without limitation, social media materials. As such, and at all times relevant to this complaint, the Varsity Defendants boosted the reputations of Defendants Davis, Hale, and ShowPro in the cheer community to obtain access to new crops of minor athletes, to boost revenues, and to boost Defendant Champion Elite and Defendants Hughes' reputations and footprints in the Varsity world.

16

81.     To further perpetuate this connection between member athletes, coaches and vendors, upon information and belief, the Varsity Defendants encouraged parents to allow their children to travel to gyms, camps and competitions, and to stay with host-families, choreographers, and gym owners, and further encouraged minor athletes to look up to these leaders in their sport.

82.     The Varsity Defendants, Defendant USA Cheer and Defendant USASF tout the safety and security of their affiliate-gyms, coaches, and vendors, and the Varsity Defendants' competitions, camps, and clinics to lull parents into comfort whereby parents have no fear for the safety of their children when working in conjunction with a Varsity-sanctioned event or a USASF member adult.

83.     The system is designed to disassociate the athletes from their families, and foster closeness with the Varsity-sponsored gyms, coaches, and gym owners.

84.     To perpetuate their scheme to create an unending pipeline of new athletes, coaches, and gym owners, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, Defendant USA Cheer and Defendant USASF rely heavily upon the network of coaches, vendors, and affiliates such as Defendants Davis, Hale, and ShowPro, going so far as to host conferences attended by gym owners, coaches, vendors, and other affiliates, providing tips and training in fundraising, athlete development, and business management.

85.      "Varsity University," which is "an enterprise powered by Varsity Brands, [and which] offers comprehensive educational programming to schools and athletic programs,"[5] is a nine-course program that encompasses three specific areas: Life Skills, Social Media, and Leadership. Varsity University hosts annual conferences during which the adults are indoctrinated into the Varsity Defendants' culture.

---

[5]      Information is available at Varsity University Online Education Programs Athletic Programs & Schools.

86.     At these conferences, known as Varsity University events, upon information and belief, coaches, gym owners, and vendors are encouraged to drink alcohol and engage in debaucheries, and are inundated with promises of gifts and financial gain if the coaches continue to produce young member-athletes who promote the Varsity brand.

87.     At all times relevant to this complaint, and upon information and belief, the Varsity Defendants have perpetuated an atmosphere at their member gyms, as well as at camps and competitions, that encourages alcohol and drug use, and which does not adequately promote athlete safety including from emotional or physical harm and abuse.

88.     By representing a safe and superior environment, Defendants collectively sought to create a revolving door of young athletes to perpetuate the organization for years, spending tens of thousands of dollars per athlete for coaching, uniforms, camps, training, competitions, and other merchandise, until the athletes either came of age or became coaches and gym owners.

## II.     **The Varsity Defendants' Control over All-star Cheer**

89.     At all times relevant to this complaint, and under the direction and control and/or supervision of Defendant Webb, Defendant Bain Capital, and Defendant Charlesbank, to perpetuate the business of the Varsity Defendants, Defendant USASF, and Defendant USA Cheer, Defendants have relied upon access to child athletes who compete at Varsity-affiliated gyms, and in Varsity competitions, and who further purchase Varsity products, uniforms, and merchandise.

90.     The Varsity Defendants created Defendant USASF through a $1.8 million interest-free loan. The 2004 non-profit charter certificate lists USASF's address to be Varsity's address.

91.     At its inception, USASF was purportedly established to be the "sanctioning body" that would regulate All-star cheer by setting guidelines, policies, procedures, and processes to ensure an environment that was safe for young athletes in the All-star cheer arena.

92.     In 2006, Defendant USASF began "certifying" All-star cheer gyms with a special seal of approval, a credential that warranted the gym and its coaching staff could be trusted for cheerleader safety.

93.     Defendant USASF also credentialed coaches and vendors, requiring that these individuals register with USASF and, by and through the USASF seal, certifying the individuals as safe, and green-lighting them to participate in USASF-sanctioned events, camps, clinics, and competitions.

94.     At all times relevant to this complaint, unless an adult registered with USASF, they would not be allowed to participate in any USASF sponsored or sanctioned activity.

95.     As a further demonstration of its authority, in 2009, Defendant USASF created the "Professional Responsibility Code," which purportedly applied to all members and established guidelines to "maximize not only the integrity and legitimacy of the all-star industry, ***but to safeguard the athletes who participate***." (Emphasis added).

96.     Yet, according to its parameters, the ethics that the USASF community strive to achieve are geared more toward discouraging member gyms from internal poaching or solicitation than respecting the bodily integrity of young athletes. For instance, the ethical standards outlined in the Professional Responsibility Code include the following:

>    i. I pledge, as a member of the USASF, I will not initiate contact with another program's athletes and families in an effort to solicit or otherwise entice them to leave the program they belong to and participate in my program. This practice is unethical;
>
>    ii. I pledge, as a member of the USASF, I will not encourage any of my athletes or family members to contact another program's athletes and families

during the competitive season in an effort to solicit or otherwise entice them to leave the program they belong to and participate in my program. This practice is unethical.

    iii.  I pledge, as a member of the USASF, I will honor and encourage everyone to respect all mutual agreements and/or contracts made between parties, whether formal or informal, by programs, coaches and athletes….

*See* USASF Professional Responsibility Code, Version 11.0, Process.

97.      By creating a Professional Responsibility Code requiring members to pledge against internal competition, USASF essentially guaranteed that gyms would enjoy uninfringed access to athletes and their families.

98.      Defendant USASF also took over the reporting and investigation into allegations of misconduct at member gyms, and by individual members, creating a central reporting mechanism. As such, if an athlete or their family wished to report an incident or issue to the member gym, the athlete was directed to Defendant USASF.

99.      In 2007, Defendant Webb and Varsity Spirit, LLC formed USA Cheer, which was also established to provide guidelines, policies, procedures, and processes to ensure a safe environment for young athletes in All-star cheer.

100.     Defendant USA Cheer was also created with an interest-free loan from the Varsity Defendants. The director of education and programs, Jim Lord, has listed Defendant USA Cheer's address to be the same as Varsity's.

101.     Defendants USASF and USA Cheer were responsible for creating and enforcing guidelines, policies, procedures, and processes for reporting coaches for misconduct and taking appropriate action for that misconduct.

102. However, Defendants USASF and USA Cheer were both operated and controlled by the Varsity Defendants.

103. The Varsity Defendants controlled Defendant USASF from inception. The Varsity Defendants submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF."

104. For at least the first 15 years of its existence, and upon information and belief, Defendant USASF's offices were located at Defendant Varsity Spirit's corporate address, a Varsity representative answered the phone for USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

105. Defendant Varsity Spirit, LLC was listed as the owner of Defendant USASF.

106. During the operative timeframe of this complaint, the Varsity Defendants also controlled the Board of Directors for Defendant USASF, which sets policy for USASF. The Board is composed of 13 voting members, one seat each for the seven cheer competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF. As Varsity has acquired more and more of Defendant USASF's founding event producers, it has continued to expand its control of the USASF Board, with as much as 75% of the seats on the Board of Directors. The seats that Varsity does not control do not have voting rights.

107. Defendant USASF's website is located at www.usasf.net, a URL which was once openly owned by the Varsity Defendants.

108. Upon information and belief, the Varsity Defendants eventually began concealing ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

21

109.     As with Defendant USASF, Defendant USA Cheer listed Defendant Varsity Spirit, LLC's Tennessee headquarters as its own headquarters, and Defendant USA Cheer's board included six Varsity employees.

110.     Under Defendant USA Cheer's bylaws, its thirteen-member board must include members from the following seven organizations: The Universal Cheerleaders Association, CheerSport, National Cheerleaders Association, United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest.

111.     Each of the seven aforementioned associations is owned by Defendant Varsity Spirit.

112.     John Patterson, a former staffer of the Nonprofit Risk Management Center who consulted on youth sports safety, said he has never heard of an arrangement quite like the one between Varsity Sprit, LLC and these non-profit governing bodies. He said Varsity Spirit, LLC's control of USASF meant, "whatever Varsity wants, Varsity can get" in terms of rules and regulation of the cheer world.

113.     Defendant Jeff Webb, has publicly stated that teams performing at Varsity Competitions who wore a full Varsity uniform and accessories received higher scores.

114.     Upon information and belief, this structure meant that the Varsity Defendants were entirely self-regulated and were not answerable to any independent entity.

115.     In the 2010s, and amidst reports of sexual abuse against young athletes competing in a variety of sports, Congress authorized the creation of the U.S. Center for SafeSport, whose goal is to end sexual, emotional, and physical abuse on behalf of athletes.

116.    Around the same time, in 2010, in Cheer Coach & Advisor Magazine[6], Defendant USASF was officially quoted as saying, "Through credentialing, coaches are made aware of expectations as teachers and role models. It is the goal of the USASF to infuse good decisions into each and every credentialed coach so that they may expand the positive life experience of all-star cheerleading and dance into the lives of the youth they encourage. USASF is recognized as the baseline of education for each individual coach and also expect these standards to be met."

117.    Upon information and belief, since its founding, USASF has purported to support the SafeSport mission, and has recognized the importance of protecting athletes from sexual, physical, and emotional abuse within the sport.

118.    At all times relevant to this complaint, athletes and their families, including John Doe 1, understood Defendant USASF was responsible for protecting athletes from harm.

119.    Instead, and specifically related to Plaintiff John Doe 1, USASF has failed in its obligation to appropriately investigate reports of misconduct, to communicate internally and with law enforcement about misconduct, and has further failed to operate as intended.

120.    The Varsity Defendants, through Defendants USASF and USA Cheer, can and do enforce bans of athletes, coaches, vendors, affiliates, and teams in competitions for minor rule infractions like the size of hairbows and the use of glitter. However, these Defendants have repeatedly failed to enforce suspensions or bans of coaches, choreographers, and music producers who are known or suspected to have committed child sexual abuse.

121.    As set forth herein, Defendant Varsity Spirit, LLC, through Defendants USASF and USA Cheer, has created and is responsible for oversight and enforcement of their Professional Responsibility Codes, which in addition to discouraging competition among members, specifically

---

[6]    At the time of this particular issue, Defendant Webb served on the editorial board of Cheer Coach & Advisor.

acknowledges the threat of harm or abuse by coaches in cheer. For instance, according to the USASF Professional Responsibility Code, "Once a coach-Athlete relationship is established, a Power imbalance is presumed to exist throughout the coach-Athlete relationship (regardless of age) and is presumed to continue for Minor Athletes after the coach-Athlete relationship terminates until the Athlete reaches 20 years of age."

122.    According to its own literature, the Professional Responsibility Code is applicable to "all members," which includes and encompasses individual Defendants Hale and Davis.

123.    At the same time that Defendant USASF and Defendant USA Cheer, and even the Varsity Defendants, publicly supported the mission of SafeSport, the Varsity Defendants were simultaneously lobbying against the inclusion of cheer as a sport.

124.    The Varsity Defendants' efforts to preclude cheer from being considered a sport is directly in line with Defendant Varsity Spirit's business model. If cheer were considered a sport, it would necessarily increase athlete oversight and regulation, and would diminish the times, methods, and places that the athletes would be allowed to compete.

125.    From 2014 to 2018, Defendant Charlesbank wholly owned the Varsity Defendants and thus owned Defendants USA Cheer and USASF and provided capital to the Varsity Defendants and Defendants USA Cheer and USASF for the purpose of building the network of Varsity-affiliated private gyms and coaches throughout the United States.

126.    During this same timeframe, Defendant Charlesbank, as well as the Varsity Defendants, reaped massive financial benefits associated with the growing network of families who came into Varsity-affiliated gyms, and who believed the Varsity Defendants' representations that they were providing safe and protective environments for families.

127.     In 2018, Defendant Bain Capital purchased the Varsity Defendants from Charlesbank for roughly $2.8 billion. At the time of the sale, Defendant Charlesbank made a new investment in Varsity alongside Defendant Bain and retained a minority stake in the business.

128.     Related to its purchase, Defendant Bain Capital stated: "This new partnership presents Varsity Brands with an exciting opportunity to continue to expand and improve our products and services while remaining steadfast to our commitment to improving student life and overall engagement…. Bain Capital's extensive consumer and technology experience and their commitment to our mission of empowering young people will help us accelerate our growth to a new level."[7]

129.     In addition, Defendant Bain represented: "For over 50 years, Varsity Brands has served as an essential force for good as part of the academic and athletic student experience…We are excited to partner with the company's experienced, committed management team to amplify the company's ecommerce operations and digital expansion, while accelerating its growth through complementary acquisitions and organic initiatives to become the go-to source for every school's sport, spirit and achievement needs."[8]

130.     Upon information and belief, Defendant Bain's accelerated growth model for the Varsity Defendants depended upon access to an ever-expanding network of young athletes who would not only purchase Varsity branded merchandise, but would also continue to attend Varsity events. In that regard, during the operative timeframe, the Varsity Defendants issued annual

---

[7]     *See* "Varsity Brand, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity," June 19, 2018, available at: Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity | Bain Capital.

[8]     *Id.*

invoices to members, including coaches, gyms, and athletes, payment of which was mandatory and ultimately profited Defendant Bain and its minority partner Defendant Charlesbank.

131.    Meanwhile, at the time of Defendant Bain's acquisition, the Varsity Defendants were embroiled in very public litigation arising not only out of the Varsity Defendants' alleged anti-competitive tactics in acquiring gyms and curbing other event-companies.

132.    In 2020, former Varsity-member coach and "Cheerlebrity" Jerry Harris, star of the Netflix series "Cheer," was accused of soliciting sex from two children during the 2019 Varsity-competition season. Harris plead guilty in February, 2022, and was sentenced in July, 2022 on two counts, one of which included traveling across state lines with the intent of soliciting sex from a minor. This traveled occurred in conjunction with a cheer competition.

133.    After the Bain acquisition, on December 7, 2020, Defendants USASF and USA Cheer announced a universal system for reporting athlete safety concerns, as well as a central repository listing ineligible coaches and individuals. Defendants USASF and USA Cheer stated that these measures "will provide a robust athlete safety infrastructure readily available across the entire cheer community."

134.    This list, the "Unified Ineligibility List," is accessible online, lists the nature of the infraction, occasionally provides public documentation, and names the offender.

135.    As of the date of filing, this list included roughly 230 names and entities. Neither Defendant Davis nor Defendant Hale are included on the list.

136.    Upon information and belief, the vast majority of the suspensions, both temporary and permanent, are related to claims of sexual misconduct between minors and their coaches, choreographers, and other adults. Some of the alleged misconduct dates back more than ten years.

137.     Far from providing security for athletes, the list is replete with temporary suspensions where the only information provided is "Member policy violated related to athlete protection," with no records or other documentation.

138.     In addition, the list does not provide the status of the investigation, and, upon information and belief, is not updated on a regular basis.

139.     Any USASF member who is suspended has the right to appeal the decision. Yet, and upon information and belief, the affected athletes never receive notice that the suspended coach has invoked their appellate rights, nor are the athletes otherwise involved in this appellate process or decision.

140.     Defendant USASF admits on its own website that it does not include all decisions, but rather "only those that could pose a potential risk to the broader sport community." Whether an offense rises to the level of posing a potential risk to the broader sport community is left entirely to the discretion of USASF.

141.     The majority of instances of misconduct included on the USASF list arise out of sexual harm or misconduct. This repeated misconduct gave notice to all Defendants that a broader issue existed within the Varsity Defendants' cheer community.

142.     Yet, other than the list, upon information and belief, the Varsity Defendants made few if any modifications to the internal screening process for coaches, and made no modifications to the gym and competition environment.

143.     Defendant USASF also puts forth an annual membership directory, which identifies adult members, and represents that every adult member included on the directory has undergone Safe Sport training.

27

144. Upon information and belief, during the interim of the allegations set forth in this complaint related to Plaintiff John Doe 1, the Varsity Defendants, in conjunction with Defendant USASF and Defendant USA Cheer, have hosted multiple competitive events, and have sponsored or endorsed camps and clinics throughout the United States.

145. At the same time, individual gyms and coaches would receive substantial benefits from affiliation with the Varsity Defendants, including the reputational benefits of being affiliated with Defendant USASF, Defendant USA Cheer, the Varsity Defendants' brands, and monetary benefits directly linked to the number of competitions in which a gym participated as well as the number of athletes the gym brought to the competition.

146. To perpetuate the popularity of certain gyms, coaches, and vendors, the Varsity Defendants utilized social media, often liking posts and messages by specific athletes and coaches and providing these same athletes and coaches with promotional codes to pass on to minor athletes to sell the Varsity Defendants' goods and services.

147. In this way, the Varsity Defendants perpetuate the enterprise, boosting the reputations and exposure of selected individuals, while member gyms, coaches, and affiliates supplied the Varsity Defendants with hundreds of millions of dollars of revenue from under-age athletes.

148. Upon information and belief, the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital relied upon adult members to create a replenishing group of underage athletes, and future coaches, and gym owners, to provide a guaranteed stream of revenue.

149. As such, and upon information and belief, it was contrary to the Varsity Defendants' business model for Defendants USASF and USA Cheer to ban adult members from

their system, as every adult member represented a pipeline of current and future revenue for the Varsity Defendants.

150.     Rather, when allegations about a specific coach or Varsity affiliate were made, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer either ignored the allegations, determined the allegations were not "credible" based upon arbitrary criteria, or allowed the would-be abuser to quietly exit the Varsity-affiliated program, with the result that the accused could relocate to a new gym or facility without parents knowing about the allegations of misconduct.

151.     At all times relevant to this complaint, and upon information and belief, Defendants Bain Capital and Defendant Charlesbank knew or should have known that the Varsity Defendants, Defendant USASF, and Defendant USA Cheer were not appropriately enforcing policies, processes, and procedures related to athlete safety, and that the Varsity Defendants were hosting events without regard for, and in contravention to the safety of child athletes.

152.     Moreover, and upon information and belief, to incentivize coaches and gyms, Defendants Bain Capital, and Charles Bank authorized, and the Varsity Defendants offered, significant monetary benefits to increase sales of Varsity goods, and participation in Varsity events, including by providing cash rebates and promotional codes, as well as in creating event environments that comingled child-athletes with adult coaches, gym owners, and choreographers. In these environments, it was reasonably foreseeable that the athletes would be minimally supervised.

153.     Upon information and belief, this environment fostered and contributed to the sexual, mental, and physical abuse inflicted upon the athletes.

154.     Upon information and belief, this competition environment was the brainchild of Defendant Jeff Webb, who used the competitions as a mechanism for his companies to establish dominance in the cheer market.

155.     During the  timeframe relevant to this complaint, Plaintiff is informed and believes that employees of the Varsity Defendants resigned their positions because of the abuse and systemic failures they saw within the system, including failures to uniformly apply policies and procedures related to athlete safety, rampant drug use within the leadership of the Varsity Defendants, as well as alcohol and drug use by athletes during competitions, and general favoritism and promotion of teams that chose to endorse or affiliate with the Varsity Defendants, disadvantaging independent teams.

156.     Defendant Webb was previously Varsity's president but resigned in 2020 amid the Jerry Harris sex abuse scandal.

157.     During the operative timeframe of this complaint, Defendant USASF received numerous reports and allegations against coaches, choreographers, videographers, and music directors. Upon information and belief, the general response from Defendant USASF was to disregard these reports and accusations as attempts by disgruntled athletes and parents to get coaches and gyms in trouble if the athletes did not receive coveted team positions.

158.     A 2020 investigative series by journalists Marisa Kwiatkowski and Tricia L. Nadolny for USA Today revealed scores of repeat sex offenders active within USASF certified

gyms and preferred vendor lists.[9] Some of the cases of which Defendants Bain Capital, Charlesbank, and the Varsity Defendants had or should have had knowledge include:

a.  A Virginia gym owner was convicted of sexual battery and assault and placed on the sex offender registry after three girls he coached at his Virginia gym came forward. As of 2020, this coach was still listed as the gym's owner and was still USASF certified. Varsity continued to invite his gym to competitions. One of his victims had to stop cheering competitively because her convicted abuser was allowed to stay involved around children and in proximity to her.

b.  A Charlotte coach who was arrested for two counts of sexual assault of a minor and lost his middle school teaching job continued to have access to minors afterward. Though the gym's owners claimed he was told he was no longer welcome to work with the gym's athletes after his arrest, he continued to appear in official social media accounts of the gym, was connected by the gym director to parents for private lessons and attended a Varsity event in Florida where he was photographed posing next to the gym's athletes in a gym uniform with the word "Coach" on his shorts.

c.  A coach who had been fired from a gym and charged with child pornography was discovered to still be working in the cheer industry by the gym owner who had originally fired him. The gym owner called Varsity, who told her his background check was fine. After she went to the courthouse to get the records of his conviction

---

[9]  https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/

https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

and sent them to Varsity, months passed and the man continued coaching children at Varsity events through USASF gyms.

    d.   A Washington gym owner was not banned by USASF until more than a year after the organization received reports in 2018 that he had been accused of sexual misconduct with minors.

159.    Moreover, and upon information and belief, during the operative timeframe Defendant USASF refused or failed to report non-member coaches and adults accused of misconduct to law enforcement – contravening its representation that USASF and its members are mandatory reporters. (*See,* USASF Terms and Conditions of Coach Membership).

160.    Upon information and belief, Defendant USASF has received hundreds of complaints against coaches, choreographers, videographers, and others accused of sexual misconduct.

161.    Until recently, however, Defendant USASF failed to dedicate fulltime staff to managing investigation of these complaints.

162.    Ginger Wilczak, the part-time contract employee USASF eventually hired to field reports of misconduct, stated that she worked 10 hours per week at most.[10] In an interview with Mary Carillo in an HBO Real Sports investigative segment, she reported that she had been actively prevented from taking the necessary actions to perform the job function for which she was purportedly hired.

163.    Defendant USASF has been excruciatingly slow to develop policies and procedures for keeping athletes safe from sexual abuse in an industry rife with it.

---

[10]   https://usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

164.     Meanwhile, according to its website: "USASF is the U.S. All Star Federation. It's about safety standards. It's about coaches' education. It's about providing a safe environment to allow for the continued growth of all-star cheerleading and dance across the country. ***It's about parents knowing their children are being taught using safe methods that are in accordance with the standard of care***. It's about standardization of rules from one competition to the next. It's about time." (Emphasis added).

165.     In the years since this public representation, however, Defendant USASF's gym and coach training has focused almost exclusively on avoiding physical injury to the athletes.

166.     In fact, Defendant USASF's "Athletic Performance Standards" dealt only with things like hair accessories, makeup, uniforms, choreography, and music. The general message is that Defendant USASF concerns itself more with how its athletes look than how its coaches behave.

167.     In 2012, Defendant USASF reiterated its "image and appearance policy" to address "the increasing criticism about the general appearance of our athletes during competition and the unflattering media stories that have focused on how our sport is presenting its athletes, particularly those in the younger age groups."

168.     At the same time, Defendant USASF began offering, but not requiring, a $1 million sexual abuse/sexual molestation policy to gym owners through K&K Insurance.

169.     It took until 2015 for Defendant USASF to implement background checks on certified coaches and gym owners. However, Defendant USASF failed to uniformly apply the process.

170.     Defendant USASF also created the "Triple A" challenge as part of its response to the SafeSport Act that became law in 2018, but in so doing, effectively shifted responsibility for

reporting abuse and exploitation from the corporate entities empowered to oversee the sport onto minors and their families telling athletes they should ask when posting photos to social media: "Is it Athletic? Is it Age Appropriate? What does it Amplify?" The Varsity Defendants asked for "thoughtful" social media posts to be hash-tagged with "#ThisIsAllStar and "#usasfATHLETES1st" as part of their safety plan.

171.    Meanwhile, Defendant USASF failed to follow its own procedures with respect to rampant reports of child sexual abuse, allowing complaints to stall or delaying action when their policies clearly call for an adult member to be suspended or banned.

172.    Jim Lord, Defendant USA Cheer's director of education and programs, said in 2020 that the organization's banned list is one of the tools they use to keep athletes safe. The manner in which this oversight was performed, according to Lord, was that he had it on his "weekly checklist" to visit search engines and use terms like "cheer coach", "athlete abuse", and "sexual assault" to find people to ban[11]. Between June and September that year, Lord had identified five (5) names. Investigative reporters with USA Today managed to find 180 people during that same time frame. More than 140 of those had been convicted of a child sex crime and more than half of those were registered sex offenders.

173.    Also in 2020, W. Scott Lewis, partner at legal and risk management firm TNG, criticized Defendant USASF's handling of reports and complaints in that they often sat on their hands and did nothing, assuming law enforcement had been contacted by someone else. He said it was not typical for organizations to wait for law enforcement action before taking their own action unless they've explicitly been asked to do so. He said, "You don't want to be on the sideline saying,

---

[11]    It is telling of the problem that Lord used words related to sexual abuse when looking for coaches, gym owners, and affiliates who violated USASF policy. This very specific search criteria demonstrates that USASF understood the risks of harm inherent to the sport.

'Well, we can't do anything because law enforcement's doing it,'" Lewis said. "You want them to have the ability to engage in interim measures or your own investigation, or both." In May of 2021, Defendant USASF hired TNG to consult on its athlete safety practices.

174.    Well after the very public arrest of Jerry Harris, Defendants USASF and USA Cheer finally began offering risk and safety training to member gyms and personnel.

175.    However, instead of mandating this risk and safety training for all members, and providing training free of charge, the Varsity Defendants require members to pay an additional fee to access Defendant USASF and Defendant USA Cheer's safety training.

176.    Defendant USASF also began "requiring" that all member programs "have clear, written guidelines that prohibit adults who have contact with minors from engaging in conduct that is either inappropriate and/or illegal."

177.    Defendant USASF failed however, to provide oversight on reviewing or approving those policies, or even verifying that gyms had, in fact, enacted guidelines.

178.    Defendant USASF's obligation for a member-program to create policies and procedures also created a gap where choreographers, and other vendors, and affiliates were still allowed to access minor athletes without corresponding guidelines.

179.    Defendant USASF has stated that it does not have the ability to enforce its policies and procedures, referring to these as "recommendations" rather than requirements.[12]

180.    As it relates to USASF's online reporting system, experts have raised concerns over the burden of the reporting process. When printed, the required forms are over 15 pages long.

---

[12]    *See* "Varsity Brands Owns Cheerleading and Fights to Keep it From Becoming an Official Sport," Leif Regstad, Houston Press (Jul. 21, 2015) available at: https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.

181.     Moreover, the reporter must cite to the alleged rule or regulation their attacker violated, referring to a slew of different sources.  By so doing, Defendant USASF shifted its mandatory duty to report child abuse to the victim and their family.

182.     In addition, the cumbersome nature of the reporting process, coupled with the fear many feel coming forward against adults who would not immediately be ousted, effectively chilled reporting.

183.     Kelli Hughes, the director of the Center for Child Policy, found Defendant USASF's reporting process to be unnecessarily complicated and burdensome.

184.     For the 2021 USASF Worlds at Disney World in Florida held in May of 2021, the organization sent out an information packet which contained athlete conduct rules but did not address coach conduct. The policy mandated one (1) adult chaperone, defined as anyone 21 of years of age or older, for every nine (9) child athletes.

185.     Webinars on athlete safety listed at the site in November 2021 included topics like "tumbling drills", "coed stunting", "building transitions", "choreography", "twisting skills theory", and "flyer stability and flexibility". Conspicuously absent at this crucial time was any training on preventing or reporting child sexual abuse or molestation.

186.     In short, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, and Defendants USASF and USA Cheer, have created an elaborate illusion of a safe system in order to draw more members in so they could sell more merchandise and collect more fees for events and camps, knowing their young vulnerable members were at risk and that they were doing nothing about removing the criminal coaches, affiliates, gym owners, and administrators creating that risk.

### III.    The Abuse: John Doe 1

187.    As stated herein, at all times relevant to this complaint, Defendants Hale, Davis, and ShowPro were certified members of Defendant USASF, and were authorized to interact with and provide choreography and coaching services to minor member athletes such as Plaintiff John Doe 1.

188.    In 2014, Defendants Hale, Davis, and ShowPro contracted to provide choreography services to Plaintiff John Doe 1's gym in Avondale, Ohio. At the time, Plaintiff John Doe 1 was 15 years old.

189.    During the initial meeting, Defendants Hale, Davis, and ShowPro accompanied Plaintiff and his gym owners and other minor athletes on a day trip to Cedar Point.

190.    In late April, 2015, Plaintiff John Doe 1 moved to a new gym in Brecksville, Ohio. This gym would also contract with Defendants Hale, Davis, and ShowPro for choreography services.

191.    Beginning in 2016, Defendants Hale and Davis began to exchange messages with Plaintiff John Doe 1 using an App.

192.    On or around July 28, 2016, when Plaintiff was 17 years old, Defendants Hale and Davis were back in Ohio to once again provide cheer training and choreography services to Plaintiff John Doe 1's former gym.

193.    During this July, 2016 trip to Ohio, Defendants Davis and Hale once again exchanged messages with Plaintiff John Doe 1. At all times relevant to this complaint, Defendants Davis and Hale knew that Plaintiff John Doe 1 was a minor under the age of 18, and that Plaintiff was a USASF member athlete.

194.     Despite knowledge of Plaintiff John Doe 1's status as a minor USASF member athlete, Defendants Davis and Hale pressed Plaintiff John Doe 1 to come to their hotel room in Westlake, Ohio.

195.     Plaintiff John Doe 1 was hesitant and initially refused. Ultimately, Plaintiff went to Defendants' hotel room in Westlake, Ohio. Upon arrival, he learned that Defendants would soon be providing a skills clinic for Plaintiff John Doe 1's current gym.

196.     When Plaintiff John Doe 1 appeared at the Defendants' hotel, Defendants took Plaintiff into their room. Defendants offered John Doe 1 liquor, which Plaintiff John Doe 1 refused. Thereafter, they commenced to have sex with Plaintiff John Doe 1, who was only 17 years old.

197.     According to the report Plaintiff John Doe 1 provided to law enforcement, Defendants had sex with Plaintiff John Doe 1 multiple times despite the fact that Plaintiff John Doe 1 demonstrated his reluctance and attempted to leave.

198.     During this incident, Defendant Davis was 24, and Defendant Hale was 25.

199.     After Defendant Hale's choreography contract with Plaintiff John Doe 1's gym ended, Plaintiff John Doe 1 was called into a meeting with his gym owner to discuss potential inappropriate conduct between Plaintiff John Doe 1 and Defendant Hale. Plaintiff John Doe 1 was made aware of accusations that Defendant Hale was giving Plaintiff John Doe 1 preferential treatment. Other than this meeting asking Plaintiff John Doe 1 about possible preferential treatment, Plaintiff John Doe 1's gym made no other inquiries and took no other action, and Defendant Hale was allowed to continue as a choreographer within Defendant USASF's network.

200.     On or around June 20, 2020, and knowing that Defendants Hale and Davis were still working regularly within the All-star cheer community, interacting with minor members,

Plaintiff John Doe 1 sent an anonymous email about the incident to two gyms, California AllStars Ventura, and Cheer Extreme Allstars in North Carolina.

201.    Cheer Extreme Allstars never responded to the email.

202.    California Allstars requested Plaintiff John Doe 1's location, and an officer from local California law enforcement contacted the email requesting more information.

203.    On June 23, 2020, Defendant USASF's case manager Ginger Wilczak contacted the anonymous email asking Plaintiff John Doe 1 to disclose his identity.

204.    On June 25, 2020, Plaintiff John Doe 1 made a formal report to USASF.

205.    On June 28, 2020, Ms. Wiczak emailed Plaintiff John Doe 1 to confirm she was meeting with the Vice President of Membership about the allegations.

206.    On June 29, 2020, Ms. Wiczak notified Plaintiff that local Ohio law enforcement had been contacted.

207.    Beginning on July 2, 2020, Plaintiff John Doe 1 cooperated with Ohio law enforcement related to the allegations.

208.    Pursuant to the Ohio law enforcement investigation, on June 28, 2020, Amy Clark, Defendant USASF's Vice President of membership, emailed the police department related to the allegations against Defendants Davis and Hale. Per Ms. Clark's email:

> Thank you for taking the report from our internal SafeSport administrator. She will encourage the victim to come forward and pursue charges. I would like to share this perspective for both of you and your Lieutenant as well. We have a situation here, if true, where someone that was 7 years older than the minor invited an interaction that we could all agree was, at minimum, inappropriate. Their relationship and interaction was originally introduced as the minors [sic] participation in the sport – with an outside choreographer who came to his gym. They met because of the sport.
>
> The older person (24 years of age), who asked a minor (17 years of age) to come to his hotel room at 1:30 am – held, what could be argued, as a position

39

> of power over him. Although the age of consent is 16 in the state of Ohio, the difference in age was 7 years.
>
> At minimum, we have an alleged perpetrator, who used his position of power and age differential to "encourage" a 17 year old to come to his hotel room. At worse [sic], we have an alleged perpetrator who has demonstrated his modus operandus [sic], and may have done the same thing to additional minor athletes in our sport.
>
> And, is there a legal, moral, or ethical duty to investigate this situation even if the victim does not want to press charges?...I just have concerns that if it is not pursued – someone may find all of us negligent in our duty to protect minor athletes.

Email from Amy Clark to USASF Safe Sport to law enforcement, June 28, 2020.

209. Plaintiff John Doe 1's report to USASF and the subsequent police report included screen shots of Defendants Hale and Davis soliciting Plaintiff John Doe 1 to come to their hotel room at 1:30 in the morning.

210. On July 30, 2020, Plaintiff John Doe 1 was informed that Ohio law enforcement would not pursue charges against Defendants Hale and Davis because Plaintiff was over 16 years old at the time of the incident. The investigating detective nevertheless informed Plaintiff that what happened with Defendants Hale and Davis was inappropriate.

211. At the same time, Plaintiff John Doe 1 continued to follow-up on his report to Defendant USASF. Not until September 18, 2020, nearly three months after the initial report, did Defendant USASF's SafeSport administrator confirm that Defendant USASF had initiated a third-party investigation.

212. On September 22, 2020, Plaintiff John Doe 1 scheduled a call via Zoom with Kevin McNeil, an authorized representative of USASF.

213. On September 23, 2020, Plaintiff John Doe 1 met with Mr. McNeil via Zoom, and provided details of the incident. Mr. McNeil asked Plaintiff John Doe 1 for character witnesses, and Plaintiff John Doe 1 provided names of two of his former teammates.

214.     During the interim of the allegations, Defendants Hale and Davis were temporarily suspended by Defendant USASF. On November 19, 2020, however, both Hale and Davis were removed from the suspended list. Plaintiff John Doe 1 was not notified of the decision to reinstate Hale or Davis.

215.     On November 20, 2020, Plaintiff John Doe 1 emailed Amy Clark to request a meeting about Defendant USASF's decision to reinstate Defendants Hale and Davis.

216.     Ms. Clark notified Plaintiff John Doe 1 that he would be speaking instead with counsel for USASF.

217.     On November 23, 2020, Plaintiff John Doe 1 spoke with counsel for Defendant USASF about the incident.

218.     As set forth in the call:[13]

---

[13]     At the time of the call, Plaintiff John Doe 1 was in Arizona, a one-party consent state. *See* Ariz.Rev.Stat.Ann. § 13-3005.

41



14 ████████████ so we're both on the
15 same time.  I get so confused out here
16 sometimes.  I deal with people on both
17 coasts.
18 ████████████  Right.
19 ████████████  And it's hard to
20 keep it straight.  I wanted to give you a
21 call.  First, I don't make the decisions
22 in these cases myself.  My job is just to
23 make sure that the procedures that have

Page 3

1 been established were followed.  I know
2 that interviews were conducted of you, and
3 Davis and Hale, Detective Hale -- by
4 Detective Hale.  He is -- he is an
5 independent person.  He's not an employee
6 of US All Star.
7     He reported to us that he had to
8 conclude that the proof did not establish
9 a violation that occurred.  He said that,
10 you know, you testified you were abused,
11 and they denied it.  And there were no
12 witnesses to support your claims.  So in
13 other words, he told us he couldn't go one
14 way or the other.  So it's really what we
15 call a draw.  So our hands are tied.  It's
16 going to have to be closed, as far as
17 we're concerned, has been closed.

The call continued:

Page 6

1     Now, beyond that, you know, what --
2 what they did, you know, may in -- may
3 call for other disciplinary measures, but
4 I don't think that has been concluded yet.
5 ████████████  So I just -- I also
6 just want to be clear.  So me having
7 screen shots of messages of them
8 soliciting me to come to their hotel room
9 at 1:00 in the morning, knowing that I'm a
10 minor, as well as having at least three
11 other people confirm my story to the
12 investigator, that is not sufficient
13 evidence.  Is that -- is that what you are
14 saying?
15 ████████████  Well, I'm saying the
16 evidence didn't quite turn out that way.
17 The witnesses didn't witness the event
18 that you're claiming happened.
19 ████████████  Right.  But they were
20 aware of the event when it did -- when it
21 was occurring.
22 ████████████  Well, that's the
23 problem, is that they didn't witness the



Page 7

1   event.  They are accepting what you told
2   them as true, ▮▮▮.  And I'm not saying
3   it's not, but I'm just saying it's just
4   not proof as far as the investigator was
5   concerned.

6   ▮▮▮▮▮▮  But them soliciting me
7   to come to their hotel room was not
8   sufficient evidence either that that did
9   happen?
10  ▮▮▮▮▮  That - that is
11  something that is still, as I mentioned to
12  you, under consideration by the
13  disciplinary committee on what that might
14  - what actions that might justify.  But
15  the first thing was to determine whether
16  or not there was proof that the violation
17  had occurred.  If it had been established,
18  they would be permanently ineligible, so
19  that was the first step.
20  ▮▮▮  Okay.  So it seems like
21  - okay.  I don't have anymore questions.
22  ▮▮▮▮  Okay.  Well, I'm
23  sorry.  That's all I can - you know, all



Page 8

1   I can do is report to you.
2   ▮▮▮▮  Right.
3   ▮▮▮▮▮  You know, I'm the
4   attorney, and as I said, I don't -- I
5   don't make these decisions.
6   ▮▮▮▮▮  Yeah.
7   ▮▮▮▮  And I don't do the
8   interviews, and I don't consider the
9   proof.  I just try to make sure that the
10  procedures were followed that have been in
11  place.
12  ▮▮▮▮  Right.  All right,
13  then.  Well, if you have nothing else for
14  me, then I think we are -- I think we're
15  good here.
16  ▮▮▮▮  Okay.  Well, enjoyed
17  talking to you.  Take care.
18  ▮▮▮▮  Thank you.
19  ▮▮▮  Good-bye.
20  (AUDIO CONCLUDED)
21
--

219.     Following this call, Plaintiff John Doe 1 never heard from Defendant USASF again related to this incident, and Defendants Hale and Davis were allowed to continue working with minor children in connection with USASF member gyms.

220.     At all times relevant to this complaint, Defendants USASF, as authorized by the Varsity Defendants was responsible for the oversight and governance of All-star cheer, and was further responsible for ensuring the sport was safe and did not unduly expose athletes to the risk of harm, including sexual abuse.

221.     At all times relevant to this complaint, Defendants Hale, Davis, and ShowPro were certified members of Defendant USASF, a designation that represented Defendants met All-star standards with respect to safety.

222.     As such, at all times relevant to this complaint, the Varsity Defendants warranted to athletes and families that the certification process was put in place to govern and empower All-star with only those adults who could be trusted to be around children.

223.     At all times relevant to this complaint, Amy Clark, Ginger Wiczak, and Kevin McNeil were employees and/or authorized representatives of Defendant USASF, working in the course and scope of their employment.

224.     At all times relevant to this complaint, Defendants Hale, Davis, and ShowPro could not have accessed minor USASF athletes without first being members of Defendant USASF.

225.     Moreover, at all times relevant to this complaint, Defendants USASF and the Varsity Defendants represented that Defendants Hale, Davis, and ShowPro were credentialed members of USASF or authorized by USASF to conduct business, adhering to Defendant USASF's policies and procedures protecting minors, including John Doe 1, from physical, sexual, and mental abuse.

44

226.     At all times relevant to this complaint, and upon information and belief, Defendant USASF and the Varsity Defendants, allowed, and represented that Defendants Hale, Davis, and ShowPro were qualified to train, mentor, and otherwise interact with minor athletes, including Plaintiff John Doe 1, and so gave Defendants wide access to minor athletes, including Plaintiff John Doe 1.

227.     Moreover, at all times relevant to this complaint, and upon information and belief, Defendant USASF authorized Defendant Hale and Defendant Davis' membership in USASF.

228.     In addition, and at all times relevant to this complaint, Defendant USASF and the Varsity Defendants knew, or had reason to know that Defendants Hale and Davis were in contact with minor athletes, such as Plaintiff John Doe 1.

229.     During the operative timeframe of this complaint, Defendants Hale and Davis were coached, trained, mentored, and/or acted as authorized representatives of Defendants USASF, and the Varsity Defendants, responsible for training and interacting with minor children, including Plaintiff John Doe 1.

230.     At all times relevant to this complaint, Defendants USASF, and the Varsity Defendants put Defendants Hale and Davis in positions of particular trust, and represented to the cheer community, including Plaintiff John Doe 1 that the community was a safe space for minor athletes.

231.     Yet, at all times relevant to this complaint, Defendants Davis and Hale posed a danger to minor athletes such as Plaintiff John Doe 1, including a danger from sexual harassment, exploitation, and abuse. Moreover, and as set forth more fully herein, other members of Defendant USASF and the Varsity Defendants' organization knew or had reason to know of the abuse perpetrated upon Plaintiff John Doe 1 by Defendants Hale and Davis, yet did nothing.

232.     At all times relevant to this complaint, Defendants Hale, Davis, and ShowPro remained in lock step with the Varsity Defendants, working as authorized vendors or affiliates of the Varsity Defendants, promoting the Varsity Defendants' sanctioned events, and merchandise, participating in the Varsity University training conferences, and annually renewing their USASF memberships in order to continue their Varsity eligibility.

233.     Meanwhile, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and, by virtue of their acquisition, ownership, and control, Defendant Bain Capital knew or should have known of the abuse being perpetrated by their members, such as Defendants Hale and Davis.

234.     At all times relevant to this complaint, Plaintiff John Doe 1 was a member of USASF, and paid dues, fees, and other valuable consideration associated with this membership, including choreography and music fees.

**The Enterprise**

235.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

236.     The unlawful acts alleged against the Varsity Defendants, Defendant USASF, and Defendant USA Cheer, as well as against Defendant Charlesbank and Defendant Bain Capital in this Complaint were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

237.     The unlawful acts alleged against Defendants Hale, Davis, and ShowPro who coached, choreographed, and perpetrated abuse upon minor athletes were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

46

238.    Defendants' officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals.

239.    Each Defendant, and any respective subsidiaries, affiliates and agents operated as a single unified entity with the common goal of taking billions of dollars from minor athletes who wanted to be a part of the competitive cheer world Defendants oversee, as well as to perpetuate a pipeline of new child-athletes, coaches and gyms. Defendants' Enterprise functioned as a continuing unit throughout the conspiracy and continues its operation through the filing of this Complaint.

240.    At all times relevant to the complaint, Defendants possessed and continue to possess an ongoing organizational structure with sufficient continuity related to the Enterprise.

241.    Each Defendant participated in the operation and management of the Enterprise.

242.    The Enterprise is separate and distinct from the pattern of racketeering activity as set forth below.

243.    Whenever in this Complaint reference is made to any act, deed, or transaction of any organization, the allegation means that the Defendants and each of them engaged in the act, deed, or transaction by or through their officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's business or affairs.

244.    Individuals alleged to have engaged in misconduct in violation of the laws pleaded herein are alleged to have done so on behalf of all members of the enterprise between the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, Defendant Bain Capital, and Defendant Champion Elite. The athletes who paid to enter the competition cheer world did not know or did not distinguish between the corporate affiliations of different

individuals. These organizations all affirmatively and collectively represent themselves as one all-star family, rather than separate parents and subsidiaries.

245.     Defendants' unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate commerce in the United States through the certification of private gym, coaches, and other members as well as the organizing, promoting, and managing cheer competitions, camps, and clinics throughout the United States.

246.     The conduct alleged herein is tied to billions of dollars of interstate commerce, with the Varsity Defendants, their governing bodies, and their parents controlling at least 80% of the competitive cheer market through membership fees, gym and coaching fees, competition fees, insurance, apparel, and travel for training and competition events all over the United States and the world.

247.     During its ownership period from 2014-2018, Defendant Charlesbank conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the competitive cheer world with the promise of a safe and superior coaching experience by joining a certified gym. Defendant Charlesbank has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so. When it sold to Defendant Bain Capital in 2018, rather than walk away from the Enterprise, Defendant Charlesbank made the conscious business decision to reinvest and retain an ownership interest in the Varsity Defendants to continue reaping the financial benefits of Varsity's Enterprise.

248.     Once ownership transferred to Defendant Bain Capital in 2018, Defendant Bain Capital conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the Varsity universe of competitive cheer

with the promise of a safe and superior coaching experience by USASF and USA Cheer certified gyms, coaches, and instructors.

249.     Defendant Bain Capital has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so through Varsity, USASF, and USA Cheer's business Enterprise with Defendants Hale, Davis, and ShowPro and continues to do so as set forth herein.

250.     All Defendants were co-conspirators in a scheme to get as many families as possible to entrust their child athletes to this network to generate massive revenue from these athletes all while Defendants were:

(a) failing to properly vet coaches, and other adult members by investigating backgrounds;

(b) failing to provide sufficient oversight and monitoring of members;

(b) failing to properly investigate complaints of inappropriate and criminal sexual conduct by the coaches, choreographers, and other members against minors;

(c) failing to report complaints of inappropriate and criminal sexual conduct against minors;[14]

(d) failing to enforce rules and regulations for chaperoning and supervision of minors;[15]

(e) failing to enforce ineligibility due to complaints regarding athlete safety;[16]

---

[14]     (*see* USASF Terms and Conditions of Coach Membership).

[15]     *See* "Sex Offender allegedly skirted ban to continue coaching cheerleaders," Jesse O'Neil, January 11, 2021, NYPost, available at: https://nypost.com/2021/01/11/sex-offender-allegedly-skirted-ban-to-continue-coaching-cheerleaders/; *see also* "Accused Cheer Monopolist Varsity Squares Off Against Ex-Employees," Daniel Libit, Sportico (Oct. 13, 2021) (Commenting before the Federal Trade Commission during an open meeting, David Owens, the director of events for the Open Championship Series told regulators Varsity's hold over USASF and USA Cheer presented "an immediate threat to the health, well-being, and safety of the children and the sport"), available at: https://www.sportico.com/leagues/other-sports/2021/accused-monopolist-varsity-spirit-1234643664/.

[16]     *See* "Cheerleading's Ban List Skips 74 Sex Offenders," Marisa Kwiatkowski & Tricia L. Nadolny, Sep. 22, 2020 USAToday.

(f) facilitating the transfer of minor athletes across state lines for the purpose or with a reckless disregard for whether the athletes would be subjected to sexual and/or physical abuse;[17]

(g) facilitating the transfer of minor athletes across state lines for the purpose of or with a reckless disregard for whether the minors would be served drugs and alcohol by other affiliated adults;

(h) gathering at predetermined locations to discuss and exchange notes and information related to the Enterprise including how to lure additional minor athletes and how to maximize profits;

(i) sending and collecting bills and invoices across the mails and wires despite the fraud perpetrated by Defendants;

(j) using member platforms to obtain access to significant financial resources of Plaintiff and other member-athletes both for annual invoices and fees, as well as for merchandise, both mandatory and otherwise;

(k) disseminating fraudulent misrepresentations through mail and wire as to the safety Defendants guaranteed through a sham certification process;

(l) collecting money from minor athletes related to the above referenced scheme;

(m) requiring memberships of all minor athletes competing on behalf of member gyms, which, in part, allowed Defendants to track and monitor the number of minor athletes under their care;

---

[17]    *See United States v. Jeremiah Harris*, C/A No. 20-CR-637, Plea Agreement available at: https://www.justice.gov/d9/press-releases/attachments/2022/02/10/harris_plea_agreement_0.pdf

(n) creating "stay-to-play" whereby Defendants mandated member gyms bring their minor athletes across state lines to competitions and stay at pre-selected hotels allowing Defendants to track these athletes and exercise control over athletes' physical locations;

(o) disseminating fraudulent misrepresentations about Defendants' member certification process through the mails and wires so as to perpetuate the image of a safe environment for minor athletes;

(p) promoting certain coaches, athletes, and members on social media who Defendants knew or should have known had engaged in illicit, predatory behavior and sexual misconduct with minors all while authorizing these same individuals to sell goods for Defendants on Defendants' platforms, or with Defendants' endorsements;

(q) mandating annual membership in Defendant USASF by athletes, member coaches, clubs, and other affiliates creating a conflict wherein the USASF received monetary benefits from certification, but was simultaneously responsible for investigating misconduct of these same members;

(r) prohibiting athletes from transferring out of certain gyms so as to chill reporting and control competition;

(s) chilling athletes from coming forward with allegations;

(t) creating marketing materials and personas specifically intended to target and attract young children to the sport, including by using certain color schemes, wording, and imagery (*e.g.* Varsity AllStar Instagram page, Varsity Spirit Instagram Page);

(u) failing to employ reasonable policies, procedures, guidelines and safeguards consistent

51

with the purported "standard of care" Defendants have represented in their materials;[18]

(v) failing to properly staff, fund, resource, train, and otherwise enable the implementation of the instruments by which Defendants promised to police and govern the sport;[19] and

(w) as to the Varsity Defendants, interfering with the safety and regulatory operations of Defendants USA Cheer and USASF.[20]

## JOINT AND SEVERAL LIABILITY

251.    Defendants are jointly and severally liable for the damages and injuries sustained by Plaintiff, as Defendants' individual and collective actions and omissions actually and proximately caused Plaintiff's past, present, and ongoing injuries. Plaintiff is entitled to damages pursuant to the laws of the State of Ohio and the United States of America, including but not limited to the following:

a.   Compensatory, actual, and consequential damages;

b.   Statutory damages;

c.   Punitive damages;

d.   Reasonable attorneys' fees and costs;

---

[18]    *See* September 18, 2020 article in the USA Today, and commenting on the arrangement between Defendants USASF and Varsity Spirit. In the article, former Risk Management Center staffer John Patterson says that "Whatever Varsity wants, Varsity gets [from USASF]."

[19]    *See* Commentary from Ginger Wilczak, former USASF Safesport Manager and part-time contract employee on the perpetual understaffing and lack of resources in USASF's office tasked with investigating reports of misconduct, "A huge slap in the face': Frustrations Grow Over Cheerleading's mishandled sexual misconduct cases," Tricia L. Nadolny, Marisa Kwiatkowski, USA Today (Dec. 23, 2020), available at: https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

[20]    *See* "Cheerleading Antitrust suit spurs brawl over ex exec's documents," Daniel Libit, Sportico (Jan. 12, 2022) (available at: https://www.sportico.com/law/news/2022/varsity-spirits-antitrust-accusers-1234658119/).  In the article, ex-Varsity executive Marlene Cota bluntly states her impression that Varsity placed its brand over the safety of athletes. Cota was also featured in an episode of HBO's Real Sports.

e.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT I
## VIOLATION OF THE PROTECTING YOUNG VICTIMS FROM SEXUAL ABUSE ACT, 18 U.S.C. §2255 (ALL DEFENDANTS)

252.    Plaintiff John Doe 1 hereby realleges the preceding paragraphs as if repeated verbatim herein.

253.    This claim is brought against all Defendants, with the specific acts complained of performed by Defendants Hale, Davis, and ShowPro against Plaintiff John Doe 1 and enabled by the ongoing certification and ratification of the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital.

254.    Under the statute, a covered individual means an adult who is authorized by a national governing body, a member of a national governing body, or an amateur sports organization that participates in interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization.

255.    Under the statute, the term "event" includes travel, lodging, practice, competition, and medical treatment.

256.    Defendants Hale, Davis, and ShowPro, qualify as covered individuals and the facts of this case bear out that abuse occurred at events defined by the statute.

257.    Defendants Hale, Davis, and ShowPro were held out by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital

as being members and part of a safe network of coaches, choreographers, vendors, and other affiliates.

258.     Plaintiff was a minor at the time he was sexually abused and assaulted in contravention of 18 U.S.C § 2422, thus constituting violations of 18 U.S.C. §2255.

259.     Plaintiff has suffered personal injuries as a result of these violations of law.

260.     Plaintiff is entitled to damages pursuant to the laws of United States of America, including but not limited to the following:

    a.  Compensatory, actual, and consequential damages, or, in the alternative, liquidated damages in the amount of $150,000;

    b.  Reasonable attorneys' fees and costs;

    c.  Punitive damages; and

    d.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT II
### FOR CIVIL CONSPIRACY IN VIOLATION OF THE RICO ACT
### PURSUANT TO 18 U.S.C. §1962(c) and §1962(d)
### (ALL DEFENDANTS)

261.     Plaintiff John Doe 1 hereby realleges the preceding paragraphs as if repeated verbatim herein.

262.     This count is brought against all Defendants.

263.     United States law makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…" 18 U.S.C. §1962(c).

264.    Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each of them is capable of holding, and does hold, "a legal or beneficial interest in property."

265.    Defendants' activities include at least two (2) acts of racketeering activity since at least 2003. Accordingly, Defendants' conduct constitutes a pattern of racketeering activity. 18 U.S.C. § 1961(5).

266.    The racketeering activity is set forth in paragraphs 28-226 and includes violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud)[21] and 18 U.S.C § and 2422, (sexual exploitation of minors).

267.    In or around 2002, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer formed an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4).

268.    Thereafter, and at all times relevant to this complaint, Defendants Hale, Davis, and ShowPro joined the enterprise.

269.    Defendant Charlesbank and Defendant Bain Capital agreed to facilitate this Enterprise by funding its ongoing operation in order to obtain significant financial benefits worth billions of dollars.

270.    This Enterprise as previously described in this Complaint, consists of a group of persons associated together for the common purpose of recklessly, intentionally, and willfully endangering the Plaintiff as a minor athlete by exposing him to illegal sexual abuse and

---

[21]    As referred to herein, the following paragraphs set forth factual allegations that constitute mail fraud and/or wire fraud: 2, 3, 4, 5, 6, 7, 8, 38, 47, 48, 49, 50, 53, 54, 56, 57, 58, 59, 61, 62, 63, 66, 68, 76, 78, 79, 80, 82, 84, 85, 90, 91, 92, 93, 94, 95, 98, 99, 100, 103, 108, 116, 117, 121, 122, 123, 125, 126, 127, 131, 133, 134, 135, 136, 137, 140, 143, 146, 150, 157, 164, 167, 170, 172, 175, 185, 187, 188, 190, 191, 200-206, 208, 211, 212, 213, 214, 215, 216, 217, 218, 221, 222, 225, 226, 227, 230, 234, 247, 248, 249, 250.

exploitation of children while continuously and repeatedly taking money from Plaintiff, and also assuring his parents and/or guardians he was particularly safe in order to take this money.

271.     The Defendants, and all of them in concert with the Enterprise, were engaging in misleading and fraudulent messaging to children and their families which they knew or should have known endangered children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

272.     In 2014, Defendant Charlesbank funded the purpose of this Enterprise.

273.     In 2018, Defendants Bain Capital took over a role in funding the purpose of this Enterprise in place of Defendant Charlesbank.

274.     The Varsity Defendants, Defendant USASF, Defendant USA Cheer, and Defendants Hale, Davis, and ShowPro acted in concert to commit the predicate acts of mail fraud and wire fraud as set forth in the preceding paragraphs.

275.     The funding, materials, and premises provided by the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital and the communication of particular trust and safety carried out by Defendant USASF facilitated the commission of these predicate acts by Defendants Hale, Davis, and ShowPro, which allowed for the sexual crimes perpetrated against Plaintiff John Doe 1, set forth more fully herein.

276.     The Defendants knew or should have known that inappropriate contact was occurring between credentialed coaches and minor athletes based on seeing the inappropriate contact, as well as the one-on-one coaching being marketed and the travel of these children across state lines with coaches, as well as rumors of misconduct, some of which has even been captured on camera, engaging in illegal and inappropriate acts with the minors.

277.     The Defendants owed a duty to the minor Plaintiff, and his family, to disclose reports of inappropriate behavior and sexual relationships with children, to report crimes alleged against them, as well as to properly investigate and to mitigate allegations related to sexual assault against children such as Plaintiff John Doe 1.

278.     The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

279.     The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

280.     The fraudulent mail and/or wire messages include, for specificity, but are not limited to the following:

   a. USASF 2009 Professional Responsibility Code and annual updates;

   b. USASF Athlete Protection Messaging at the website and via email on November 16, 2017;

   c. The 2020 Uniform Ineligible List, which Defendants falsely represented was a mechanism by which Defendants were properly patrolling and purging the sport of potentially dangerous adults;

   d. Social media posts and images either promoted by or shared by Defendants, where Defendants supported the proliferation of Defendants Champion Elite and Jones, and individual coaches;

   e. Marketing targeted toward minors and child athletes and specifically recruiting these athletes to travel over state lines to member gyms, and for camps, and competitions;

   f. The creation of "Cheerlebrity," as a means to attract new minor athletes;

g. Annual membership renewal for Defendant Hale;

h. Annual membership renewal for Defendant Davis;

i. Annual credentialing and/or authorization for Defendant ShowPro;

j. Fees accepted by Defendants USASF and/or Varsity from Defendants Hale, Davis, and ShowPro related to membership;

k. Investigations, reports, correspondence, communications related to Plaintiff John Doe 1's incident report against Defendants;

l. Fees accepted by USASF and/or the Varsity Defendants from Plaintiff John Doe 1 during the interim of time of the abuse, and thereafter;

m. Annual billing and/or invoices to Plaintiff for his USASF membership renewal;

n. Billing and/or continuing to receive payment from Plaintiff for uniforms, and other requisites of competition;

o. Billing, invoicing, and/or fees for music, choreography, travel, and hotels;

p. Solicitation of Plaintiff John Doe 1 sent via wire;

q. Communications by and between representatives of Defendant USASF and Plaintiff John Doe 1 related to Defendant USASF's investigation into the underlying incident that is the subject of this case;

r. In 2021, USASF's website falsely claimed that they were requiring background checks in 2015 of "all coaches and adult members". However, this was untrue. Background checks were only required for entry into the "warm up room" at competitions. It was never implemented with respect to coaching children or being around them in any capacity outside their competition routine;

s. In 2021, USASF indicated that it was partnering with the U.S. Center for SafeSport ("SafeSport") as part of its responsibility to athletes to prevent sexual abuse – however, and upon information and belief, the USASF has yet to implement the requisites of SafeSport for its coaches, vendors, and volunteers;

t. Consecutively, on May 10, 2018, and May 16, 2019, the period just before Worlds at Disney, USASF disseminated the following messaging: "Athlete Safety is our #1 Priority! Our mission includes 'strive for a safe environment for our athletes.' To the USASF, safety extends beyond our Cheer or Dance safety rules for performance. We're committed to helping our members create the safest overall environment for every all-star athlete, so we've made resources available for use in gyms and studios;"

u. Defendants' concerted efforts to prevent all-star cheer from being designated a "sport," which would have interrupted the Varsity Defendants' profits through regulation;

v. The Varsity Defendants' representations related to USASF and adoption of SafeSport;

w. USASF's representations related to the benefits of competing at "sanctioned events," which was a proxy for Varsity events;

x. Continued messaging by USASF that child sexual abuse and exploitation by predators was an outside problem that could be prevented by paying more attention to how cheerleaders were presenting themselves on social media.

y. In July of 2019, USASF shifted the blame to child athletes warning them the "risk and responsibility" of sexual exploitation and objectification required them to

"make better choices" about their appearance to "minimize the risk[.]" It did this with full knowledge of repeated reports that the industry was rife with abuse among its own coaching and gym owner ranks and that they were actively concealing these predators so that they could continue to feed the revenue stream.

z. USASF's athlete protection messaging continued at this time to primarily address athlete safety from sexual exploitation and abuse from the perspective of how athletes were presenting themselves through appearance and how that might affect the brand's image through an "image and appearance policy".

aa. USASF and USA Cheer codes of conduct and other policy statements, which were purportedly administered to all USASF members, and which touted that athlete safety was a priority, when, in fact, neither entity had uniform methods by which to ensure athlete safety;

bb. Materials associated with Varsity University, a gym and coaching conference;

cc. Such additional statements, messages, and/or materials as may be revealed during discovery in this matter.

281.    Plaintiff John Doe 1 had a property interest in his membership dues paid as set forth above and other fees and costs, and in the continued ability to cheer competitively, and Defendants induced Plaintiff John Doe 1 through promises of social media notoriety, "Cheerlebrity" status, scholarship opportunities, and, to become a cheer coach himself, to achieve "legend status", to become a gym owner, or to become an event promoter.

282.    The actions of the Enterprise and its conspirators were the direct and proximate cause of these injuries to the Plaintiff.

283.    But for the fraudulent assurances to Plaintiff John Doe 1 and his parents that the gyms, coaches and affiliates were certified safe, the abuse would not have occurred causing the injuries described above.

284.    Plaintiff is entitled to damages pursuant to the laws of the United States of America, including but not limited to the following:

    a.  Compensatory, actual, and consequential damages, trebled in accordance with the statute;

    b.  Reasonable attorneys' fees and costs;

    c.  Punitive damages; and

    d.  Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

**COUNT III**
**GROSS NEGLIGENCE**
**(ALL DEFENDANTS)**

285.    Plaintiff hereby realleges the preceding paragraphs as though repeated verbatim herein.

286.    Plaintiff brings this claim for gross negligence against all Defendants.

287.    At all times relevant to this Complaint, Defendants have been responsible for the safety, health, and welfare of minor athletes, such as Plaintiff, who were members of Defendants USASF, and USA Cheer, participants in Defendant Varsity events, competing for Varsity-affiliated gyms, and under the care, custody, and control of each of the Defendants, respectively.

288.    At all times relevant to this complaint, Defendant USASF, the Varsity Defendants, and Defendants ShowPro, Hale, and Davis have represented that credentialing generally, and specifically, provided superior safety for athletes such as John Doe 1.

289.     At all times relevant to this complaint, Defendants have been aware that there are dangers associated with coaches training minor athletes, including risks associated with inappropriate, and non-consensual sexual touching, emotional, and physical abuse.

290.     At all times relevant to this Complaint, Defendants represented that they had rules, policies and/or procedures specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches, and adults who interact with these athletes by virtue of the adults' positions of power. These policies, procedures, rules, and/or guidelines included representations related to SafeSport, and that Defendants USASF and USA Cheer were uniquely situated to help govern and regulate All-star cheer.

291.     At all times relevant to this complaint, Defendants have represented that competing on behalf of the system governed by Defendant USASF and USA Cheer is the means to maximize athlete protection for minor athletes such as Plaintiff John Doe 1.

292.     At all times relevant to this complaint, Defendants owed special duties to protect minor children, such as Plaintiff John Doe 1, who was an athlete competing on behalf of a credentialed member club. Plaintiff John Doe 1 entrusted Defendants with Plaintiff John Doe 1's physical, mental, and emotional care and well-being, and Defendants held themselves out as being uniquely able to protect minors such as Plaintiff John Doe 1 from harm caused by physical or other abuse.

293.     Despite this, at all times relevant to this Complaint, Defendants have been aware that violations to their internal policies, processes, procedures, and guidelines related to athlete safety, and, in particular, safety against harm from sexual, physical, and emotional abuse and exploitation has happened on a regular and continuous basis by and through USASF and USA Cheer certified adult members, including Defendants Hale and Davis.

294.     Defendants violated their responsibilities and duties to Plaintiff John Doe 1 in one or more of the following particulars:

      a.  Allowing Defendants Davis, Hale, and ShowPro access to Plaintiff John Doe 1 when Defendants knew or reasonably should have known that Defendants Hale and Davis posed a threat of harm to Plaintiff John Doe 1;

      b.  Permitting Defendants Hale and Davis to remain in positions of power and particular trust over minor athletes, such as Plaintiff John Doe 1;

      c.  Allowing Defendants Hale and Davis to isolate Plaintiff John Doe 1 despite the known dangers associated with one-on-one coaching and interactions;

      d.  Failing to enforce social media and other communications policies and procedures related to inappropriate conduct between minor athletes and adult members;

      e.  Failing to report known instances of abuse or misconduct;

      f.  Failing to adhere to SafeSport policy or procedure;

      g.  Failing to investigate potential misconduct, including among and between Defendants Hale, and Davis, and Plaintiff John Doe 1, despite knowledge that such inappropriate contact had occurred;

      h.  In the event such investigation was conducted, failing to reasonably conduct the investigation for the protection of a minor;

      i.  Failing to train, supervise, monitor, or implement policies and procedures related to Defendants' employees and/or authorized representatives and their interactions with minors such as Plaintiff John Doe 1;

      j.  Failing to provide safe premises;

k.  Failing to protect Plaintiff John Doe 1 from the foreseeable harm inflicted on him by a third party;

l.  Continuing to hold Defendants Hale, Davis, and ShowPro out as trustworthy adults capable of providing safe services in the sport; and

m.  Such other conduct as may be revealed.

295.    At all times relevant to this complaint, Defendants have known that one-on-one coaching, and intimate coach contact is an enhanced feature of All-star coaching that generates a great deal of money for all Defendants in the enterprise.

296.    Defendants are also aware of the close personal relationships many of these coaches form with minor athletes who adult members gain access to by virtue of their USASF and USA Cheer credentials.

297.    Defendants are further aware that, despite the known dangers of one-on-one contact, adult members routinely engage in intimate and exclusive contact with minor athletes, as well as travel with minors across state lines, even staying in the same hotel rooms with no other chaperone, while participating in competitions, camps, and clinics.

298.    And when complaints or reports have surfaced, or social media images and videos circulate depicting illegal activity with minors, the Defendants disregard or ignore same, do not report to any agencies, do not permanently strip coaches of their eligibility, and often rally around coaches who have been accused of illegal conduct with minors, even ostracizing families who have complained or reported.

299.    Defendants' actions and omissions, by and through their authorized agents, were unreasonable, constituted the total absence of care, and breached duties owed to Plaintiff, and actually and proximately contributed to and/or caused damages.

300. Defendants' actions and omissions as described above, by and through authorized agents, were in violation of Defendants' own policies, procedures, and what would be reasonable under the circumstances.

301. Each incident of abuse and exploitation detailed in this matter constitutes a separate occurrence.

302. Plaintiff is entitled to damages pursuant to the laws of Ohio, including but not limiting to the following:

    a. Compensatory, actual, and consequential damages;

    b. Punitive damages; and

    c. Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

**COUNT IV**
**NEGLIGENT SUPERVISION**
**(VARSITY DEFENDANTS, DEFENDANT USASF, DEFENDANT**
**USA CHEER, AND DEFENDANT SHOWPRO)**

303. Plaintiff hereby realleges the foregoing paragraphs as though repeated verbatim herein.

304. Throughout the relevant timeframe of this complaint, Defendant USASF, the Varsity Defendants, and Defendant ShowPro continued to employ, credential, and place Defendants Hale and Davis in particular and unique positions of trust by allowing access to minor athletes, such as Plaintiff John Doe 1.

305. Despite claiming to conduct background checks and remove eligibility certification from coaches, gyms, or adult members where complaints or reports of misconduct have been made, Defendants continue to let Defendants Hale and Davis operate, manage, and coach for Defendant ShowPro and to provide choreography services in order to generate income for the enterprise.

306.     Furthermore, when Defendants became aware of allegations against Defendants Hale and Davis, either of sexual misconduct, Defendants failed to take reasonable corrective action, instead preserving the reputation of the enterprise so that trust in its safety continued to generate income for the enterprise.

307.     Defendants' business model relies upon certifying private gyms, coaches, and adult members pursuant to the USASF standard, which purports to place athlete health and safety above all else.

308.     Moreover, Defendant ShowPro's business model relies upon being an authorized choreographer, allowed to contact and provide services for Defendant USASF's minor athletes.

309.     In perpetuating a business model built on trust and athlete safety, Defendants specifically undertook a duty to ensure that reputation for trust and safety was earned and that dangerous individuals committing atrocious illegal acts were removed from the competitive cheer network Defendants oversaw.

310.     Defendants breached this duty in a number of particulars including by credentialing Defendants Hale and Davis, allowing them to remain in settings with regular access to minor athletes, when Defendants knew or should have known they posed a significant threat of harm, failing to act or otherwise disregarding reports of abuse, discounting or otherwise ignoring specific information about Defendants Hale and Davis and his inappropriate interaction with Plaintiff John Doe 1, among other particulars.

311.     Defendants' grossly negligent, willful and wanton conduct, set forth more fully herein, directly and proximately caused Plaintiff's injuries.

312.     As a direct and proximate result of Defendants' conduct, the Plaintiff has sustained physical, mental, and emotional damages, among others.

313.     Plaintiff is therefore entitled to a judgment against Defendants, and for such actual and consequential damages in an amount to be determined by a jury trial.

## COUNT V
## ASSAULT/BATTERY
## (DEFENDANT SHOWPRO, DEFENDANT HALE, AND DEFENDANT DAVIS)

314.     Plaintiff hereby realleges the foregoing paragraphs as though repeated verbatim herein.

315.     At all times relevant to this complaint, the assault, battery, and abuse set forth herein, occurred while Plaintiff was a minor under eighteen years of age, and while he was a citizen and resident of Cuyahoga County, Ohio.

316.     At all times relevant to this complaint Defendant ShowPro, as the employer and/or entity responsible for Defendants Hale and Davis, allowed an adult coach to access minor athletes including Plaintiff John Doe 1 and to illegally commit unwanted and nonconsensual sexual touching of the Plaintiff John Doe 1.

317.     Said touching by Defendants Hale and Davis constituted sexual assault and sexual battery on this named Plaintiff and others.

318.     As a direct and proximate result of these Defendants' conduct, set forth more expressly above, Plaintiff John Doe 1 experienced bodily injury, physical pain and suffering, and mental anguish and is entitled to an award of actual damages in an amount to be determined through a trial of this matter.

## COUNT VI
## BREACH OF CONTRACT
## (AS TO THE VARSITY DEFENDANTS AND DEFENDANT USASF)

319.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

320.     At all times relevant to this complaint, Plaintiff had duly executed contracts with the Varsity Defendants and Defendant USASF where, in exchange for valuable consideration from Plaintiff, Defendants agreed to provide a competitive and gym environment that was safe, secure, and free from harm, specifically physical and sexual abuse.

321.     Plaintiff has undertaken to procure copies of the contracts entered into but these agreements were only accessible online, and as Plaintiff did not renew his membership with Defendants, he no longer has access to these contracts. These contracts were entered into annually however, and should still be available to Defendants through Defendants' archives.

322.     As set forth herein, during the course of these contractual agreements, Plaintiff was subjected to severe and oppressive abuse, physically and mentally by adults who were credentialed and supported by Defendants, and who Plaintiff would not have come into contact with but for Defendants' network.

323.     During the term of these agreements, the Varsity Defendants and Defendant USASF failed to provide Plaintiff with a safe and secure environment, including by failing to enforce the policies, procedures, and standards expressly adopted by Defendant USASF related to credentialed coaches and adult members.

324.     These failures on the parts of the Varsity Defendants and Defendant USASF constitute violations of the fundamental and material terms of the agreements between Plaintiff, and the Varsity Defendants and Defendant USASF.

325.     The Varsity Defendants' and Defendant USASF's failures were so egregious and unconscionable as to render the agreements null and void.

326.     As such, Plaintiff seeks an order from this court finding that Defendants' conduct constitutes a breach of the contractual arrangement between Defendants and Plaintiff, rescinding

said contracts, and remitting the valuable consideration Plaintiff paid to Defendants during the relevant timeframe, as well as for all such attorneys' fees, costs, and interest to which Plaintiff may be entitled.

## COUNT VII
## UNJUST ENRICHMENT
### (AS TO DEFENDANT SHOWPRO, THE VARSITY DEFENDANTS, DEFENDANT BAIN CAPITAL, AND DEFENDANT CHARLESBANK)

327.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

328.     As set forth herein, the cheer industry represents a multi-billion-dollar enterprise where each young athlete annually spends thousands of dollars toward gym memberships, private lessons, uniforms, accessories, competition fees, music, choreography, and membership with USASF.

329.     At all times relevant to this complaint, Plaintiff conferred non-gratuitous benefits upon Defendants including annual competition and membership fees, as well as continuous revenue toward uniforms, accessories, private training, and other monetary benefits.

330.     Defendants realized the value of these benefits, including steady annual revenue per athlete.

331.     To date, none of the benefits Defendants realized have been returned or otherwise disgorged.

332.     Under the circumstances set forth herein and above, it would be inequitable for Defendants to retain the benefits conferred by Plaintiff including through Plaintiff's annual membership fees and competition fees.

333.     Plaintiff is therefore entitled as a matter of equity to recover these benefits from Defendants and for all such additional relief as this Court deems proper.

## COUNT VIII
## FRAUD
## (AS TO THE VARSITY DEFENDANTS, AND DEFENDANT USASF)

334.     Plaintiff realleges the preceding paragraphs as though repeated verbatim.

335.     At all times relevant to this complaint, Plaintiff was a party to numerous annual contracts whereby Plaintiff agreed to pay Defendants annual and recurring fees in exchange for a safe competitive environment and training facility, and further agreed to pay substantial additional consideration and fees to Defendants.

336.     As part of these agreements, Defendants represented to Plaintiff that Defendants would be responsible for ensuring a safe environment and access to safe adults for Plaintiff including an environment free from sexual, physical, and mental harm and exploitation.

337.     Defendants' promises were material to Plaintiff's agreements, without which no agreements would have existed.

338.     Plaintiff had a right to rely upon Defendants' promises.

339.     As set forth herein, even at the time they entered into the agreements with Plaintiff, Defendants knew or had a reckless disregard for whether the environment they provided at competitions, in the gym environment, at clinics, and camps, and through certified coaches, was safe and free from harm and sexual, physical and mental abuse.

340.     In fact, at all times relevant to this complaint, Defendants knew that the environment they provided actually facilitated access by predators to underage athletes.

341.     Yet, with knowledge or a reckless disregard for whether Defendants were providing safe environments for child athletes, Defendants nevertheless entered into the agreements and began collecting fees from Plaintiff.

342.     Upon information and belief, Defendants' misrepresentations included, without limitation:

a. Certifying to Plaintiff that Defendants were responsible for providing safe competitive and training environments;

b. Certifying to Plaintiff and his family that the adults involved in the gyms, and competitions, including choreographers, had been duly vetted;

c. Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had exhibited disturbing behavior;

d. Facilitating an unchaperoned environment for child-athletes;

e. Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

f. Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

g. Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

h. Such additional conduct as may be revealed during discovery and the trial of this case.

343. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain significant mental, physical, and emotional injuries and damages.

344. Plaintiff now seeks an order from this court setting aside the referenced agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiff for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## COUNT IX
## NEGLIGENT SECURITY
### (AS TO THE VARSITY DEFENDANTS, DEFENDANT SHOWPRO, DEFENDANT BAIN CAPITAL & DEFENDANT CHARLESBANK)

345.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

346.     At all times relevant to this complaint, the Varsity Defendants, Defendant Bain Capital, Defendant ShowPro, and Defendant Charlesbank sponsored, created, hosted, attended and oversaw private all-star gyms, camps, clinics, coaches, choreographers and competitions, all established and governed by Defendants, and under the supervision of Defendants.

347.     At all times relevant to this complaint, if athletes competed at the private all-star gyms, camps, clinics and competitions hosted by the Varsity Defendants, and Defendants Bain Capital and Charlesbank, the athletes had no meaningful choice but to attend at the locations, and under conditions, established by Defendants.

348.     The Varsity Defendants, Defendant ShowPro and Defendants Bain Capital and Charlesbank received substantial revenue from these events.

349.     As part of their promotion of these events, the Varsity Defendants, Defendant ShowPro, and Defendants Bain Capital and Charlesbank undertook a responsibility to ensure that the locations and events were safe for attendees, minor athletes who were likely to encounter adult coaches, choreographers, videographers, and attendees.

350.     The Varsity Defendants, Defendant ShowPro, and Defendants Bain Capital and Charlesbank violated their responsibility to provide safe premises free from harm from third parties in one or more of the following particulars:

a.  Disparate enforcement of policies, procedures, and guidelines related to suspensions, with the result that coaches were still allowed to attend Varsity Competitions and represent Varsity-affiliated private all-star gyms;

b. Failure to provide adequate monitoring;

c. Failure to provide sufficient background checks, with the result that hundreds of potential threats were allowed to gain access to underage athletes;

d. Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol, and sexual solicitation and exploitation within the sport;

e. Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic images while in the course and scope of the sport;

f. Failing to ensure that Varsity member coaches and adults were not forcing themselves upon minor athletes, including at Varsity member gyms and Varsity events;

g. Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults affiliated with Defendants;

h. Such additional conduct as may be revealed during discovery.

351. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain significant mental, physical, and emotional injuries and damages.

352. Plaintiff now seeks an order from this court setting aside the agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiff for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

**COUNT X**
**CIVIL CONSPIRACY**
**(AS TO ALL DEFENDANTS)**

353.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

354.     At all times relevant to this complaint, Defendants were a collective group of individuals working in concert and individually toward a common plan.

355.     As described more fully herein, Defendants, acting as a collective group and individually, and at all times relevant to this complaint, were engaged in the process of recklessly, intentionally, and willfully endangering the Plaintiff, a minor athlete, by exposing him to sexual abuse and exploitation while assuring him and his family that Defendants were providing safe conditions and premises for the athletes to compete.

356.     As described more fully herein, Defendants' conduct included misleading and fraudulent messaging to children and their families which Defendants knew or should have known would endanger children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

357.     At all times relevant to this complaint, Defendants were motivated by the substantial revenue, profits, and funding paid by the athletes and their families in exchange for the fraudulent messages and misrepresentations made by Defendants.

358.     In 2014, Defendant Charlesbank funded this scheme, providing additional capital for Defendants to perpetuate their misrepresentations.

359.     In 2018, Defendants Bain Capital took over the primary role in funding the purpose this scheme. Defendant Charlesbank retained an interest however in the misrepresentations and resultant monetary benefits.

360.     Defendants acted in concert to perpetuate this scheme.

74

361.     In addition, Defendants knew or should have known that the funding, materials, and premises provided by Defendants were material to the abuses and harm suffered by the minor athletes, as well as the continued perpetuation of revenue from these athletes.

362.     The Defendants knew or should have known that inappropriate contact was occurring between coaches, choreographers, videographers, and other adults and minor athletes, some of which was even captured on camera, or via messaging, engaging in illegal and inappropriate acts with the minors.

363.     The Defendants owed a duty to minors including Plaintiff John Doe 1, and his family, to make reports, disclose reports, and adequately address reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

364.     The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

365.     The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

366.     But for the fraudulent assurances to his parents that the gyms, coaches, and member adults were certified safe, the abuse would not have occurred, and Plaintiff would not have suffered continued economic harm derived from paying substantial dues and fees predicated in large part on promises of a safe environment for minor athletes.

367.     As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to damages including but not limited to the following:

> a. Compensatory, actual, and consequential damages, trebled in accordance with the statute;
>
> b. Punitive damages; and

75

> c. Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## COUNT XI
## RESPONDEAT SUPERIOR
## (AS TO DEFENDANTS USASF AND SHOWPRO)

362.     Plaintiff hereby realleges the foregoing paragraphs as though repeated verbatim herein.

363.     At all times relevant to this complaint, Defendant USASF employed and retained certain individuals, including Amy Clark and Ginger Wicszak to provide safety and regulatory services, including, without limitation, conducting investigations intended to prevent and mitigate athlete harm in USASF cheer.

364.     At all times relevant to this complaint, agents, employees, and/or authorized representatives of Defendant USASF were acting in the course and scope of their employment.

365.     At all times relevant to this complaint, Defendant ShowPro employed and retained Defendants Hale and Davis as coaches and choreographers and authorized Defendants' access to minor athletes including Plaintiff John Doe 1.

366.     At all times relevant to this complaint, Defendants Hale and Davis were acting in the course and scope of their employment, as authorized representatives of Defendant ShowPro.

367.     As such, at all times relevant to this complaint, Defendants USASF and ShowPro were as responsible for the actions, inactions, omissions and failures of their employees, agents, and/or representatives as though they undertook the actions themselves.

368.     As set forth herein, Defendants failed to properly train, supervise, provide monitoring, and/or to implement the policies, procedures, and guidelines, greatly increasing the likelihood of bodily injury and harm to athletes such as Plaintiff John Doe 1.

369.     As set forth herein, Defendants Hale and Davis committed sexual battery, non-consensual touching, and inappropriate acts against Plaintiff John Doe 1.

370.     As set forth herein, Defendant USASF, by and through its employees, representatives, and/or agents failed to appropriately monitor, report, and implement policies or procedures in All-star cheer, increasing the likelihood of harm against minor athletes, such as Plaintiff John Doe 1.

371.     This conduct directly and proximately caused Plaintiff John Doe 1 to sustain continuing and ongoing injuries, including physical and emotional damages.

372.     Plaintiff John Doe 1 therefore seeks an order from this court against Defendants, and is further entitled to actual, consequential, and such additional damages, including punitive damages as this court deems just and proper.

**COUNT XII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(AS TO ALL DEFENDANTS)**

373.     Plaintiff John Doe 1 realleges the preceding paragraphs as though repeated verbatim herein.

374.     As set forth herein and above, at all times relevant to this complaint, Defendants had a duty or duties to Plaintiff to use due and reasonable care to protect Plaintiff from foreseeable harm in a number of particulars, and not to inflict physical, emotional, or psychological injury upon the Plaintiff.

375.     As set forth herein and above, Defendants violated their responsibilities to Plaintiff John Doe 1 in one or more particulars, including:

   a.     Certifying to Plaintiff that Defendants were responsible for providing safe gyms and competitive environments;

77

b.  Certifying to Plaintiff and his family that the adults involved in the competitions and training, including choreographers, had been duly vetted;

c.  Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had exhibited disturbing behavior;

d.  Facilitating an unchaperoned environment for child-athletes;

e.  Fostering a party culture for child athletes, including an environment where alcohol and drugs were readily available;

f.  Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

g.  Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

h.  Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

i.  Disparate enforcement of policies, procedures, and guidelines related to coaching suspensions, with the result that coaches and choreographers were still not permanently banned from interacting with minor athletes;

j.  Failure to provide adequate monitoring at the gyms, camps, events and competitions;

k.  Failure to undertake sufficient background checks;

l.  Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol;

m.  Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or

were not solicited to provide pornographic images while attending Varsity events or cheering for or on the premises of USASF member-gyms;

n.      Exposing minor athletes to potential harmful adults with knowledge or a reckless disregard for the safety of the minor athletes;

o.      Failing to ensure that adult coaches and athletes were not forcing themselves upon minor athletes;

p.      Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults;

q.      Such additional conduct as may be revealed during discovery.

376.    Defendants' conduct set forth above is so outrageous as to go beyond all bounds of decency and is to be regarded as odious and utterly intolerable be unacceptable in a civilized community.

377.    Moreover, Defendants' conduct has directly and proximately caused serious, severe, and pervasive emotional and mental injury to Plaintiff John Doe 1 and will require reasonably certain future care.

378.    Plaintiff John Doe 1 now seeks judgment against Defendants and for damages in an amount to compensate him for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

<u>**COUNT XIII**</u>
**VIOLATION OF CONSUMER SALES PRACTICES ACT, R.C. 1345.02(A)**
**(AS TO THE VARSITY DEFENDANTS, DEFENDANT USASF,**
**AND DEFENDANT SHOWPRO)**

379.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

380.    At all times relevant to this complaint, the above-named Defendants entered into contractual relationships with the Plaintiff and his family, taking fees for membership, training, choreography, competition, and travel, while promising safe environments overseen by vetted adult members of USASF.

381.    The safety and trust touted by these Defendants was material to Defendants' business model, and with the contractual arrangements and relationships entered into between Plaintiff and his family and the Defendants.

382.    The safety and trust referred to herein, which was a material representation by Defendants, caused Plaintiff and his family to pay copious annual fees and dues, as well as fees associated with competition, travel, music, choreography, uniforms, and other monetary assessments, all while Defendants knew or had reason to know that Plaintiff was being subjected to sexual and financial abuse and exploitation.

383.    When Defendants obtained knowledge of complaints about certain inappropriate or illicit activity by and between Defendants Davis and Hale and Plaintiff, the above-named Defendants failed to implement proper protocols, policies, and/or procedures, or failed to abide by same to ensure the ability of minor children, such as Plaintiff, to be free from sexual and/or physical and emotional harm.

384.    The Ohio Consumer Sales Practices Act ("CSPA"), R.C. 1345.02(A), prohibits suppliers from committing unfair, deceptive, or unconscionable acts or practices in connection with consumer transactions.

385.    Defendants are "suppliers" as they are engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer.

386.    Defendants' conduct constitutes deceptive practices in connection with consumer transactions, as evidence by the fact that numerous Plaintiffs, who were minors at the time of the alleged misconduct, have come forward with similar information related to Defendants' conduct, failures, act, and/or omissions in overseeing, enforcing, and providing a secure and safe environment for Plaintiff and other child athletes.

387.    Defendants' unfair and deceptive methods and practices have directly and proximately resulted in harm to Plaintiff John Doe 1, including physical harm, as well as harm related to contractual duties and responsibilities Defendants held themselves out as providing to Plaintiff, and which Defendants neither executed upon nor delivered.

388.    Plaintiff is entitled to damages pursuant to the laws of the State of Ohio, including but not limited to:

a.   Compensatory, actual, and consequential damages;

b.   Reasonable attorney's fees and costs;

c.   Punitive damages where available; and

d.   Such additional and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court award the following damages, jointly and severally against Defendants, as provided by the laws of the United States and Ohio, including but not limited to the following:

a.    Compensatory, actual, and consequential damages to Plaintiff, trebled where permitted by statute;

b.    Alternatively, liquidated damages as to Count I;

c.       Costs of this action and attorneys' fees to Plaintiff;

d.       Punitive damages where permitted; and,

e.       Any and all other and further relief as this Court may deem appropriate.

## **TRIAL BY JURY**

WHEREFORE, Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully submitted,


/s/ Chelsea C. Weaver
Charles H. Cooper, Jr.     (0037295)
Rex H. Elliott             (0054054)
Chelsea C. Weaver      (0099981)
Cooper & Elliott, LLC
305 West Nationwide Boulevard
Columbus, Ohio 43215
(614) 481-6000
(614) 481-6001 (Facsimile)
chipc@cooperelliott.com
rexe@cooperelliott.com
chelseaw@cooperelliott.com


Bakari T. Sellers*
Mario A. Pacella*
Amy E. Willbanks*
Jessica L. Fickling*
Alexandra Benevento*
Strom Law Firm, LLC
6923 North Trenholm Road, Suite 200
Columbia, South Carolina 29206
(803) 252-4800
(803) 252-4801 (Facsimile)
bsellers@stromlaw.com
mpacella@stromlaw.com
awillbanks@stromlaw.com
jfickling@stromlaw.com
abenevento@stromlaw.com

Amy L. Gaffney*
Gaffney Lewis LLC
171 Church Street, Suite 160
Charleston, South Carolina 29401
(803) 790-8838
(803) 790-8841 (Facsimile)
agaffney@gaffneylewis.com


Regina H. Lewis*
Gaffney Lewis LLC
3700 Forest Drive, Suite 400
Columbia, South Carolina 29204
(803) 790-8838
(803) 790-8841 (Facsimile)
rlewis@gaffneylewis.com

Attorneys for Plaintiff
John Doe 1


*Pro Hac Vice Applications Forthcoming*