## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

JOHN DOE 1,                                   Case No. 1:22-CV-02139

        Plaintiff,

        -vs-                                   JUDGE PAMELA A. BARKER

VARSITY BRANDS, LLC, et al.,                  MEMORANDUM OPINION AND
        Defendants.                            ORDER

Plaintiff John Doe 1 filed a Complaint in this matter on November 28, 2022 against 11 defendants.  (Doc. No. 1.)  Before the Court are three motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6) filed by three separate defendants in this case.  The motions to dismiss presently before the Court are as follows: (1) Defendant Charlesbank Capital Partners, LP's ("Charlesbank") Motion (Doc No. 53); (2) Defendant Jeff Webb's ("Webb") Motion (Doc. No. 54); and (3) Defendant Bain Capital, LP's ("Bain") Motion (Doc. No. 56).  Doe filed Oppositions to all three Motions.  (Doc. Nos. 75, 76, 77.)  Webb, Charlesbank, and Bain filed Replies in Support of their Motions to Dismiss. (Doc. Nos. 85, 88, 89.)  Charlesbank and Bain filed a joint Notice of Supplemental Authority on June 28, 2023. (Doc. No. 99.)  Webb filed a Notice of Supplemental Authority on July 19, 2023.  (Doc. No. 107.)

For the following reasons, Charlesbank's, Webb's, and Bain's Motions are GRANTED.

## I.  Factual Allegations

Plaintiff Doe is a former competitive cheerleader.  (Doc. No. 1, ¶ 1.)  Doe alleges that when he was 17 years old, he was sexually abused by two cheerleading choreographers, Defendants Brandon Hale and Taji Davis, who were allegedly affiliated with the Varsity Defendants.  (*Id.* at ¶ 4.)

In addition to pursuing claims against Hale and Davis, Doe also seeks to hold the Varsity Defendants, Varsity Spirit founder Jeff Webb, Charlesbank Capital Partners, LP, Bain Capital, LP, USA Cheer, and USASF liable for misrepresenting the safety of Varsity-affiliated gyms and competitions, and for failing to adopt and/or enforce adequate policies to prevent and/or investigate sexual abuse of minor athletes by adults affiliated with various cheerleading organizations.  (*Id.* at ¶ 3, 5-8.)

### A.    All-Star Cheerleading

This case involves myriad organizations and individuals associated with the sport of all-star cheerleading.  (Doc. No. 1.)  Private all-star cheerleading is a highly competitive and fast-paced sport that incorporates elements of cheer, dance, and tumbling.  (*Id.* at ¶¶ 34-35.)  All-star cheerleading demands that its young athletes and their families invest significant amounts of time and money.  (*Id.* at ¶ 38.)  Competitive cheerleading is not subject to traditional "seasonal" limitations but can take place year-round.  (*Id.* at ¶ 36.)  Doe alleges that athletes can expect to spend between $3,000 to $7,000 per season, and that some families may spend up to $20,000 per year for transportation, lodging, membership and entrance fees, merchandise, uniforms, and accessories related to training for, and competing in, multiple all-star competitions throughout the year.  (*Id.* at ¶¶ 36-38.)  According to Doe, the competitive cheer industry generates billions of dollars in annual revenue and may serve up to four million athletes.  (*Id.* at ¶ 51.)

Doe alleges that Webb began his career in cheerleading in the early 1970s, and began monetizing the operation of cheerleading camps throughout the 1970s and 1980s.  (*Id.* at ¶¶ 40-43.)  In the 1980s, Webb founded an organization called the Universal Cheerleaders Association, which eventually became Varsity Spirit.  (*Id.* at ¶ 42-43.)  Initially, Varsity Spirit began as a cheer camp provider, but gradually expanded its operations to include hosting competitions, merchandising,

branding, social media, and gym ownership and/or management.  (*Id.* at ¶¶ 44-45.)  By the early

2000s, Varsity Spirit's parent corporation, Varsity Brands, represented that it was the country's

largest designer, marketer, and supplier of cheerleading and dance team uniforms and accessories,

the largest operator of cheer and dance team training camps and clinics, a leading organizer of

extracurricular activity special events, a major provider of studio dance conventions and

competitions, and producer of studio dance apparel for studio dance competitions.  (*Id.* at ¶ 46.)

However, even as early as 2002, Varsity Brands' largest source of revenue allegedly came from its

connection with all-star cheer, through its subsidiary Varsity Spirit.  (*Id.* at ¶ 47.)

Doe alleges that from 2014 through 2018, Charlesbank, a private equity firm, wholly owned

the Varsity Defendants.  (*Id.* at ¶ 125.)  Doe alleges that in 2018, Bain Capital, another PE firm,

purchased the Varsity Defendants from Charlesbank for $2.8 billion, although Charlesbank retained

a minority stake in the business. (*Id.* at ¶ 127.)

According to Doe, there are two non-profit organizations that oversee competitive

cheerleading in the United States: USASF and USA Cheer.  (*Id.* at ¶¶ 23, 24.)  According to Doe,

Webb and the Varsity Defendants were heavily involved in the creation of USASF and USA Cheer,

and remain involved in the operation of both organizations.  (*Id.*)  For example, the Varsity

Defendants allegedly created USASF through a $1.8 million interest-free loan, and the USASF's non-

profit charter certificate lists the Varsity Defendants' address as USASF's address.  (*Id.* at ¶ 90.)

Likewise, Doe alleges that in 2007, Webb and Varsity Spirit founded USA Cheer through another

interest-free loan from the Varsity Defendants.  (*Id.* at ¶ 99-100.) Allegedly, USA Cheer shared an

address with the Varsity Defendants.  (*Id.*)  Doe further alleges that the Varsity Defendants submitted

the original trademark application for the marks "U.S. All Star Federation" and "USASF."  (*Id.* at ¶

3

103.) Doe further alleges that for the first 15 years of USASF's existence, its offices were located at Varsity Spirit's corporate address, a Varsity representative answered USASF's phones, USASF employees were paid by Varsity, Varsity cashed checked issued to USASF, and Varsity Spirit was listed as the owner of USASF. (*Id.* at ¶ 104.) Doe alleges that the Varsity Defendants also exerted control over the USASF and USA Cheer by maintaining control over the organizations' respective boards of directors. (*Id.* at ¶¶ 106, 109-110.)

Due to Webb's and the Varsity Defendants' alleged total control over USASF and USA Cheer, Webb and the Varsity Defendants are able to control all aspects of all-star cheerleading, including the following alleged examples:

- All athletes cheering on behalf of Varsity-affiliated gyms are required to purchase USASF memberships to compete at Varsity-sponsored events;

- All gyms, coaches, and vendors who wish to compete at and/or attend and/or offer products/services at Varsity events must also become members of USASF and pay monthly and/or annual fees to USASF, USA Cheer, and the Varsity Defendants;

- The Varsity Defendants require gyms to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity Spirit for buying Varsity-branded merchandise, participating in Varsity-sponsored events, and working with Varsity-approved vendors;

- All athletes must pay annual fees to the Varsity Defendants for music, training, competition attendance, uniforms, and accessories;

- Athletes who compete at one Varsity-affiliated gym are prohibited from transferring to another Varsity-affiliated gym without permission;

- Athletes and their families attending Varsity events are required to stay at Varsity-approved hotels (a policy Varsity has dubbed "stay to play"), allegedly at inflated rates, and any failure to comply with the stay-to-play policy could subject the entire team to disqualification;

- Webb has publicly stated that teams performing at Varsity competitions in full Varsity uniforms and accessories received higher scores; and

4

- Following the highly publicized Jerry Harris sex abuse scandal in 2020[1], USASF and USA Cheer began offering risk and safety training to member gyms and personnel, but the Varsity Defendants required members to pay additional fees to access this USASF/USA Cheer safety training.

(*Id.* at ¶¶ 56, 59, 61, 62, 64, 68, 113, 174-75.)

**B.     Doe's Allegations of Abuse**

Doe alleges that, at the time of the alleged abuse, he was a citizen and resident of Lorain County, Ohio.  (*Id.* at ¶ 14.)  In 2014, when Doe was 15 years old, Defendants Brandon Hale, Taji Davis, and ShowPro Choreography, contracted with Doe's gym in "Avondale, Ohio"[2] to provide choreography services to the gym's all-star cheerleading team.  (*Id.* at ¶ 188.)  Doe alleges that during this initial meeting, Hale and Davis accompanied Doe, his gym owners, and other minor athletes on a day trip to Cedar Point amusement park.  (*Id.* at ¶ 189.)

In April 2015, Doe transferred to a new cheerleading gym in Brecksville, Ohio.  (*Id.* at ¶ 190.) Doe alleges that his new gym would also contract with Hale, Davis, and ShowPro for choreography services.  (*Id.*)

Doe alleges that, "[b]eginning in 2016, Defendants Hale and Davis began to exchange messages with . . . Doe using an App."  (*Id.* at ¶ 191.)  Doe alleges that on or around July 28, 2016, when Doe was 17 years old, Hale and Davis returned to Ohio to provide "cheer training and choreography services to [Doe's] former gym."  (*Id.* at ¶ 192.)  Doe alleges that during this July 2016 trip to Ohio, "Davis and Hale once again exchanged messages with" Doe.  (*Id.* at ¶ 193.)  Doe alleges

---

[1] In 2020, Jerry Harris, a former Varsity-affiliated coach and star of the Netflix docuseries "Cheer," was accused of soliciting sex from two minor all-star cheerleaders.  (*Id.* at ¶ 132.)  In 2022, Harris pleaded guilty to and was sentenced on two counts related to soliciting sex from a minor.  (*Id.*)

[2] The Court observes that there is no such town in Ohio as "Avondale."  Doe does not otherwise identify the name of his former gym.

5

that, at that time, Hale and Davis knew that Doe was under 18 years old and a USASF member athlete. (*Id.*)

Doe alleges that, despite their knowledge of Doe's age and status as a USASF member, Hale and Davis "pressed" Doe to visit them at their hotel room in Westlake, Ohio.  (*Id.* at ¶ 194.)  Doe alleges that he "was hesitant and initially refused" their invitation.  (*Id.* at ¶ 195.)  However, Doe ultimately went to Hale's and Davis's hotel room.  (*Id.*)  Upon arrival, Doe learned that Hale and Davis were also going to provide a cheerleading skills clinic for his current gym during their visit to Ohio.  (*Id.*)  Hale and Davis offered Doe liquor, which he refused.  (*Id.* at ¶ 196.)  Thereafter, Hale and Davis commenced to have sex with Doe.  (*Id.*)  Doe alleges that, according to his eventual police report, he told law enforcement that Hale and Davis had sex with Doe "multiple times despite the fact that [Doe] demonstrated his reluctance and attempted to leave."  (*Id.* at ¶ 197.)  At the time of the incident, Hale was 25 and Davis was 24.  (*Id.* at ¶ 198.)

Doe alleges that after Hale's choreography contract with Doe's current gym ended, Doe was called into a meeting by his current gym's owner "to discuss potential inappropriate conduct between" Doe and Hale.  (*Id.* at ¶ 199.)  Doe alleges that he "was made aware of accusations that . . . Hale was giving [Doe] preferential treatment."  (*Id.*)  Other than the gym owner's meeting to question Doe about the anonymous complaint regarding Hale's "preferential treatment," Doe's gym made no other inquiries and took no other action, and Hale continued to work as a USASF choreographer.  (*Id.*)

Four years later, around June 20, 2020, and knowing that Hale and Davis still regularly worked with minors in the competitive cheer community, Doe sent an anonymous e-mail to two all-star gyms, one in California and one in North Carolina, reporting Hale's and Davis's abuse.  (*Id.* at ¶ 200.)  Only the gym in California responded to Doe's anonymous e-mail.  (*Id.* at ¶ 202.)  The

California gym alerted California law enforcement to Doe's report and requested that Doe provide more information.  (*Id*.)  On June 23, 2020, USASF case manager Ginger Wilczak contacted Doe's anonymous e-mail address, asking him to reveal his identity.  (*Id*. at ¶ 203.)  On June 25, 2020, Doe came forward to make a formal report to USASF.  (*Id*. at ¶ 204.)  Thereafter, Wiczak notified Doe that local Ohio law enforcement had been contacted and that she would meet with USASF's vice president of membership, Amy Clark, about Doe's allegations.  (*Id.* at ¶¶ 205-06.)

On June 28, 2020, Clark e-mailed local Ohio law enforcement and explained that Doe met Hale and Davis through the sport of all-star cheerleading.  (*Id.* at ¶ 208.)  Clark explained that the "older person" asked a 17-year-old minor to come to his hotel room at 1:30 a.m., and that this older person "held, what could be argued, as [*sic*] a position of power over him."  (*Id.*)  Clark expressed concern that though she understood Ohio's age of consent to be 16 years old, there was a seven-year age difference.  (*Id.*)  Then Clark wrote as follows:

> At minimum, we have an alleged perpetrator, who used his position of power and age differential to "encourage" a 17 year old to come to his hotel room. At worse [sic], we have an alleged perpetrator who has demonstrated his modus operandus [sic], and may have done the same thing to additional minor athletes in our sport.

> And, is there a legal, moral, or ethical duty to investigate this situation even if the victim does not want to press charges?...I just have concerns that if it is not pursued – someone may find all of us negligent in our duty to protect minor athletes.

(*Id.*)

On July 30, 2020, local law enforcement notified Doe that they would not pursue charges against Hale and Davis because Doe was over 16 years old at the time of the alleged assault.  (*Id.* at ¶ 210.)  Doe alleges that the detective handling the investigation nevertheless opined to Doe "what happened with Defendants Hale and Davis was inappropriate."  (*Id.*)

7

Doe continued to follow up on his report to USASF.  (*Id.* at ¶ 211.)  On September 18, 2020, USASF's SafeSport administrator confirmed that USASF had initiated a third-party investigation into Doe's allegations regarding Hale and Davis.  (*Id.*)  On September 23, 2020, Doe met with the third-party investigator via Zoom and provided the names of two former teammates to serve as character witnesses.  (*Id.* at ¶ 213.)  During the investigation, Hale and Davis were temporarily suspended from USASF eligibility, but on November 19, 2020, Hale and Davis were removed from the suspended list.  (*Id.* at ¶ 214.)  On November 20, 2020, Doe e-mailed Clark to discuss Hale's and Davis's reinstatement, but she notified Doe that he would be speaking with USASF's counsel instead.  (*Id.* at ¶¶ 215-16.)  According to Doe's transcript of his call with USASF's counsel, which he included in his Complaint, USASF's counsel informed him that USASF believed the evidence did not turn out in Doe's favor and that there was no proof the alleged "violation" had occurred.  (*Id.* at ¶ 218.)  Doe alleges that after his call with USASF's counsel, Hale and Davis were permitted to continue working with minor athletes at USASF member gyms.  (*Id.*)

## II.    Procedural History

Doe filed this case on November 28, 2022.  (Doc. No. 1.)  In his Complaint, Doe alleges seven counts against both Bain and Charlesbank: Count 1, violation of the Child Abuse Victims' Rights Act of 1986, 18 U.S.C. § 2255; Count 2, civil conspiracy in violation of the RICO Act, 18 U.S.C. §§ 1962(c) and (d); Count 3, gross negligence; Count 7, unjust enrichment; Count 9, negligent security; Count 10, civil conspiracy; and Count 12, intentional infliction of emotional distress.  (*Id.*)

Doe also alleges five counts against Webb: Counts 1, 2, 3, 10, and 12.  (*Id.*)

In his Complaint, Doe alleges two bases upon which this Court may exercise subject-matter jurisdiction.  First, Doe alleges that the Court has federal question jurisdiction, pursuant to 28 U.S.C.

8

§ 1331, because "[t]his action arises pursuant to, and involves questions requiring the interpretation of[,] the law of the United States . . . ." (*Id.* at ¶ 12.)  Second, Doe alleges that "[s]upplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. § 1367(a)." (*Id.* at ¶ 13.) Notably, Doe's Complaint does *not* invoke diversity jurisdiction under 28 U.S.C. § 1332 as a basis for subject-matter jurisdiction in this case.[3]

Charlesbank, Webb, and Bain filed their respective Motions to Dismiss on February 24, 2023. (Doc. Nos. 53, 54, 56.)  Doe filed his Oppositions to these defendants' Motions on March 24, 2023. (Doc. Nos. 75, 76, 77.)  Webb, Charlesbank, and Bain filed their respective Replies on April 7, 2023. (Doc. Nos. 85, 88, 89.)  Charlesbank and Bain filed a joint Notice of Supplemental Authority on June 28, 2023.  (Doc. No. 99.)  Webb filed a Notice of Supplemental Authority on July 19, 2023.  (Doc. No. 107.)  These Motions are now ripe for a decision.

## III.    Legal Standards

### A.    Rule 12(b)(2)

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, "[t]he party seeking to establish the existence of personal jurisdiction bears the burden to establish such jurisdiction, 'over each defendant independently.'"  *Beydoun v. Wayaniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014) (quoting *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006)).  If a court rules on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction prior to trial, "it has the discretion to adopt any of the following courses of action: (1) determine the motions based on

---

[3] Indeed, Doe does not allege the citizenship of the limited liability company defendants at all.  Although Doe alleges the states in which the defendant-LLCs are incorporated and the states in which they maintain their principal places of business (*see* Doc. No. 1, ¶¶ 19, 20, 22), the citizenship of an LLC is not determined by its states of organization and principal place of business.  *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009).  Instead, an LLC has the citizenship of each of its members.  *Id.*  Doe alleges no facts regarding the citizenship of the LLC members.

9

affidavits alone; (2) permit discovery, which would aid in resolution of the motion; or (3) conduct an evidentiary hearing on the merits of the motion." *Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005).  "[T]he decision whether to grant discovery or an evidentiary hearing before ruling on a 12(b)(2) motion is discretionary." *Burnshire Dev., LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 434 (6th Cir. 2006).

When a district court rules on a jurisdictional motion to dismiss made pursuant to Rule 12(b)(2) without conducting an evidentiary hearing, as is the case here, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff.  *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).  To defeat such a motion, a plaintiff need only make a *prima facie* showing of jurisdiction, which can be met by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir. 2002).  A court disposing of a Rule 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal but may consider a defendant's undisputed factual assertions.  *See CompuServe*, 89 F.3d at 1262; *Theunissen*, 935 F.2d at 1459; *NTCH-West Tenn, Inc., v. ZTE Corp.*, 761 Fed. Appx. 485, 488 (6th Cir. Jan. 16, 2019) (citing *Kerry Steel, Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 153 (6th Cir. 1997)). "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . .  alleges collectively fail to state a *prima facie* case for jurisdiction." *Id*.  *See also Kerry Steel, Inc.,* 106 F.3d at 149.

## B.    Rule 12(b)(6)

Under Rule 12(b)(6), the Court accepts Doe's factual allegations as true and construes the Complaint in the light most favorable to Doe.  *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir.

2009).  To survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the Complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. Nat. Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555-56).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

11

## IV.    Analysis

### A.    Personal Jurisdiction

The Court begins with Bain's, Charlesbank's, and Webb's personal jurisdiction arguments under Fed. R. Civ. P. 12(b)(2).

All three defendants argue that this Court does not have personal jurisdiction over them.  (Doc. No. 53-1, PageID# 436; 54-1, PageID# 464; 56-1, PageID# 515.)  First, the defendants argue that the Court does not have general personal jurisdiction over them, as none of these defendants are "at home" in Ohio, and it does not have specific personal jurisdiction over them, as none of these defendants have had any contacts with the forum state (i.e., Ohio).  (*Id.*)  Webb also argues that his role as a former executive within the Varsity Defendants' organization cannot serve as a basis for the Court to exercise personal jurisdiction over him because the fiduciary shield doctrine prevents this Court from doing so.  (Doc. No. 54-1, PageID# 463.)  Second, the defendants argue that the nationwide service of process provisions found in the Child Abuse Victims' Rights Act of 1986 ("CAVRA"), 18 U.S.C. § 2255, and in the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, do not support exercising personal jurisdiction over them because Doe's federal claims fail as a matter of law.  (Doc. No. 53-1, PageID# 440; 54-1, PageID# 464; 56-1, PageID# 522 n.2.)

There are two ways Doe can establish personal jurisdiction over Charlesbank, Bain, and Webb: (1) through a "traditional" personal jurisdiction analysis under Ohio's long-arm statute and the Due Process Clause; or (2) through the nationwide service of process provisions of RICO and/or CAVRA, and then pendent claim personal jurisdiction over the state causes of action.  *See Jane Doe 1, et al. v. Varsity Brands, LLC, et al.*, No. 6:22-cv-2957, 2023 WL 4209799, at *6 (D.S.C. June 27,

2023).   If Doe establishes personal jurisdiction through the "traditional" personal jurisdiction analysis, then the Court may exercise personal jurisdiction over Charlesbank, Bain, and Webb as to both Doe's federal and state-law claims.   If Doe establishes personal jurisdiction via the federal statutes' nationwide service of process provisions, then the Court may exercise personal jurisdiction over Charlesbank, Bain, and Webb as to Doe's federal claims only, and could exercise personal jurisdiction over the defendants as to Doe's state-law claims only so long as Doe's federal "anchor" claims remain viable.   The Court begins by examining whether it may exercise personal jurisdiction over the defendants pursuant to the "traditional" personal jurisdiction analysis.

## 1.      Traditional Personal Jurisdiction

"Where a federal court's subject matter jurisdiction over a case stems from the existence of a federal question, personal jurisdiction over a defendant exists 'if the defendant is amenable to service under the [forum] state's long arm statute **and** if the exercise of personal jurisdiction would not deny the defendant[] due process." *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (emphasis added). Jurisdiction under Ohio's long-arm statute is governed by Ohio Rev. Code § 2307.382. *A.B. Pratt & Co. v. Bridgeport Grp., LLC*, No. 22-cv-1579, 2023 WL 2865640, at *6 (N.D. Ohio Apr. 10, 2023) (citing *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991)).   The due process inquiry requires determining "whether the facts of the case demonstrate that the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *Id.* (internal quotations omitted).

### a)      Ohio's Long-Arm Statute

The Ohio General Assembly amended Ohio's long-arm statute in April 2021 to extend the reach of Ohio's long-arm statute to the limits of the U.S. Constitution.   Before the amendment,

13

"Ohio's long-arm statute consisted of a list of enumerated acts set forth in § 2307.382(A), followed by an admonition in § 2307.382(C) that '[w]hen jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.'" *AmaTech Grp. Ltd. v. Fed Card Servs., LLC*, 2022 WL 44674, at *4 (S.D. Ohio Jan. 5, 2022) (quoting Ohio Rev. Code Ann. § 2307.382 (West 2019)). Based on that language, "courts routinely noted that Ohio's long-arm statute did not extend jurisdiction to the fullest extent that the Due Process Clause allows." *Id.* The amendment, however, revised subsection (C) to read: "In addition to a court's exercise of personal jurisdiction under subsection (A) of this section, a court may exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution." Ohio Rev. Code § 2307.382(C).

"Since the amendment, neither the Supreme Court of Ohio nor any Ohio appellate court has addressed the effect of this new language." *A.B. Pratt*, 2023 WL 2865640, at *7 (collecting post-amendment Ohio cases that did not address the amendment and conducted the two-step analysis of *Goldstein*). Several federal district courts, however, have interpreted the amendment and the courts disagree as to the effect of the amendment. Some courts "have concluded that Ohio's long-arm statute now extends personal jurisdiction to the fullest extent that the U.S. Constitution permits." *AmaTech Grp. Ltd.*, 2022 WL 44674, at *5; *see e.g.*, *Bren Ins. Servs., Inc. v. Envision Pharm. Servs., LLC*, 2022 WL 5160716, at *3 (N.D. Ohio Oct. 5, 2022) ("[T]he Ohio General Assembly extended Ohio's long-arm statute to the limits of the United States Constitution."); *see also Zahara Ariel, et al. v. Lionsgate Ent. Corp., et al.*, No. 2:23-cv-1916, 2023 WL 4706188, at *2 (S.D. Ohio June 14, 2023) ("After a 2020 revision, Ohio's long-arm statute became co-extensive with the limits of the federal Due Process Clause."). Other courts "have concluded that the purpose of the new language in

14

§ 2307.382(C) is merely to allow for 'general jurisdiction' over non-resident defendants in appropriate circumstances." *AmaTech Grp. Ltd.*, 2022 WL 44674, at *5; *see e.g.*, *Spyglass Grp., LLC v. Genesis Health Clubs Mgmt., Inc.*, 2022 WL 17251820, at *4 (N.D. Ohio Nov. 28, 2022) ("This amended language appears to allow the exercise of general jurisdiction over non-resident defendants where the Constitution permits. But it does not collapse the specific-jurisdiction analysis into a single due-process inquiry.") (citations omitted).

Because it is unclear whether Ohio's long-arm statute is coterminous with federal constitutional limits, the Court will analyze jurisdiction under Ohio's long-arm statute and the Due Process Clause. *See EHPLabs Research, LLC v. Smith*, 2022 WL 3139604, at *4 (Aug. 5, 2022). "After all, the statute on its face still contains the list of nine enumerated bases for exercising personal jurisdiction over an out-of-state defendant." *Spyglass Grp., LLC*, 2022 WL 17251820, at *4.

Ohio Rev. Code § 2307.382 provides:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;

(2) Contracting to supply services or goods in this state;

(3) Causing tortious injury by an act or omission in this state;

(4) Causing tortious injury in this state by an act or omission outside this state if the person regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

(5) Causing injury in this state to any person by breach of warranty expressly or impliedly made in the sale of goods outside this state when the person might reasonably have expected such person to use, consume, or be affected by the goods in this state, provided that the person also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

15

(6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in this state;

(7) Causing tortious injury to any person by a criminal act, any element of which takes place in this state, which the person commits or in the commission of which the person is guilty of complicity.

(8) Having an interest in, using, or possessing real property in this state;

(9) Contracting to insure any person, property, or risk located within this state at the time of contracting.

Charlesbank and Bain argue that Ohio's long-arm statute does not authorize exercising personal jurisdiction over them because Doe has not alleged that Charlesbank or Bain engaged in any activity within Ohio that would satisfy any of § 2307.382's nine subsections. (Doc. No. 53-1, PageID# 439; Doc. No. 56-1, PageID# 519-20.) Doe does not argue that any particular subsection under § 2307.382 applies to the instant case, but argues generally that Charlesbank's and Bain's arguments fail "in light of the pervasive relationship" between Charlesbank and Bain and the Varsity Defendants, Hale, Davis, and ShowPro. (Doc. No. 76, PageID# 821; Doc. No. 77, PageID# 857.) Doe argues that Charlesbank and Bain had a "vested interest" in the financial success of Varsity Brands. (*Id.*) Doe further argues that all of the money that he paid to USASF and the Varsity Defendants ultimately benefitted Charlesbank and Bain. (*Id.* at PageID# 822; *Id.* at PageID# 858.)

The Court concludes that Doe fails to establish that any of the nine enumerated bases in Ohio's long-arm statute apply to either Charlesbank's or Bain's activities. First, Doe does not identify—let alone argue—which of § 2307.382's nine enumerated bases apply to Charlesbank and/or Bain. (*See* Doc. No. 76, PageID# 821; Doc. No. 77, PageID# 857.) Second, Doe does not allege any facts whatsoever in his Complaint that suggest that Charlesbank and/or Bain ever transacted any business, supplied goods or services, caused injury, or had any dealings at all in Ohio. (*See* Doc. No. 1.) Third,

16

with respect to Bain, Doe alleges that Bain acquired Varsity Brands in 2018, two years *after* the alleged abuse occurred.  (Doc. No. 1, ¶ 127.)  Doe does not allege any connection between Bain's 2018 acquisition of Varsity Brands and Ohio or explain how any conduct alleged to have occurred prior to 2018 may be attributable to Bain at all.  Accordingly, the Court concludes that Doe fails to demonstrate that any of § 2307.382's nine enumerated bases apply to either Charlesbank or Bain.

Regarding Webb, in his Motion, he asserts that Ohio's long-arm statute is now coterminous with the Due Process Clause and therefore, he does not address § 2307.382 or its subsections.  (Doc. No. 54-1, PageID# 460.)  Doe does not address Webb's assertion that the specific-jurisdiction analysis is collapsed into a single due-process inquiry.  (*See* Doc. No. 75.)  Thus, neither party addresses whether Webb's activities fall under one or more of the nine enumerated bases in Ohio's long-arm statute.  However, assuming *arguendo* that the two-step jurisdictional analysis does apply in Ohio, Doe must establish that exercising personal jurisdiction over Webb comports with the Due Process Clause.  Thus, if Doe's Due Process Clause arguments fail, the Court may not exercise personal jurisdiction over Webb, irrespective of the § 2307.382 analysis.  Therefore, the Court must now examine whether it comports with the Due Process Clause to exercise specific personal jurisdiction over the defendants.

### b)      Due Process Clause

"Personal jurisdiction falls into two categories: general and specific."  *Malone v. Stanley Black & Decker, Inc.,* 965 F.3d 499, 501 (6th Cir. 2020) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  As the Sixth Circuit has explained,

> Personal jurisdiction comes in two flavors: "general" jurisdiction, which depends on a showing that the defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant, and "specific" jurisdiction,

17

> which exposes the defendant to suit in the forum state only on claims that "arise out
> of or relate to" a defendant's contacts with the forum.

*Kerry Steel*, 106 F.3d at 149 (quoting *Helicopteros Nacionales de Colombia S.A., v. Hall*, 466 U.S.

408, 414-15 & fns. 8-10 (1984)).  Here, there is no dispute that Charlesbank, Bain, and Webb are not

subject to general jurisdiction in Ohio, and the Court need only consider whether they are subject to

specific personal jurisdiction.

The Sixth Circuit has established the following three-part test for determining whether

specific personal jurisdiction exists:

> First, the defendant must purposefully avail himself of the privilege of acting in the
> forum state or causing a consequence in the forum state.  Second, the cause of action
> must arise from the defendant's activities there.  Finally, the acts of the defendant or
> consequences caused by the defendant must have a substantial enough connection with
> the forum to make the exercise of jurisdiction over the defendant reasonable.

*CompuServe, Inc.*, 89 F.3d at 1263; *see also Calphalon v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000);

*S. Mach. Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968).

First, the question of whether a defendant has purposefully availed itself or himself of the

privilege of doing business in the forum state is "the *sine qua non* for *in personam* jurisdiction."

*Mohasco Indus.*, 401 F.2d at 381-82; *see also Calphalon*, 228 F.3d at 721 ("The purposeful availment

prong . . . is essential to a finding of personal jurisdiction.").  The "purposeful availment" requirement

is satisfied when the defendant's contacts with the forum state "proximately result from actions by

the defendant *himself* that create a 'substantial connection' with the forum State," and when the

defendant's conduct and connection with the forum are such that he "should reasonably anticipate

being haled into court there."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985) (quoting

*World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)); *see also Reynolds v. Int'l Amateur*

*Athletic Fed'n*, 23 F.3d 1110, 1116 (6th Cir. 1994).

18

Courts require purposeful availment to ensure that "random," "fortuitous," or "attenuated" contacts do not cause a defendant to be haled into a jurisdiction. *Burger King*, 471 U.S. at 475 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). In this regard, the Supreme Court has explained that, in examining a defendant's contacts, courts "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). In other words, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with persons affiliated with the State." *Id*. at 286.

Second, for specific jurisdiction to attach under the second factor, "the cause of action must arise from the defendant's activities" in the forum state. *Mohasco*, 401 F.2d at 381. "To meet this requirement, a plaintiff must establish at least a 'causal connection' between a defendant's activities in the forum state and the harm to the plaintiff." *Opportunity Fund, LLC, v. Epitome Sys., Inc.*, 912 F. Supp. 2d 531, 540 (S.D. Ohio 2012) (quoting *Neogen*, 282 F.3d at 892). "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *CompuServe*, 89 F.3d at 1267 (citing *Reynolds*, 23 F.3d 1116-17).

Third, the Court must consider whether exercising personal jurisdiction over Defendants would "comport with traditional notions of fair play and substantial justice." *Id*. at 1267-68 (quoting *Reynolds*, 23 F.3d at 1117). If the Court finds that the first two requirements of the test are met, "an inference arises that this third factor is also present." *Id*. at 1268 (citing *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir. 1988)). When deciding this third element, the Court must consider "the burden on the defendant, the interest of the forum state, the plaintiff's

interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *Id.* (quoting *Am. Greetings*, 839 F.2d at 1169-70).

"Failure to meet any one of the three prongs means that personal jurisdiction may not be invoked." *Maclin v. Reliable Reps. Of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018).

The Sixth Circuit recognizes the fiduciary shield doctrine in the context of personal jurisdiction, "under which 'if an individual has contact with a particular state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise, by that state, of jurisdiction over him personally on the basis of that conduct.'" *Zobel v. Contech Enters.*, 170 F. Supp. 3d 1041, 1045 (S.D. Ohio 2016) (quoting *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 697 (6th Cir. 2000)).  However, "the Sixth Circuit has also enumerated circumstances under which the fiduciary shield doctrine does not apply." *Id.*  When an out-of-state agent "is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on the traditional notions of fair play and substantial justice; *i.e.,* whether [the agent] purposely availed herself of the forum and the reasonably foreseeable consequences of that availment." *Balance Dynamics Corp.*, 204 F.3d at 698.  In such situations, a court must conduct a traditional due process analysis to determine if the out-of-state agent's "contacts with the [forum state] were such that due process permits the exercise of personal jurisdiction over them." *Id.*

Applying these principles to Charlesbank and Bain, the Court finds that Doe fails to satisfy the first prong of the specific personal jurisdiction analysis.  Doe fails to allege any facts that remotely suggest either defendant purposely availed itself of the privilege of doing business in Ohio.  Doe does not allege that either defendant maintains offices or agents in Ohio, owns property in Ohio, reached into Ohio to solicit, initiate, or transact business, engages (or previously engaged) in significant or

20

long-term business activities within Ohio, or is bound to litigate in Ohio pursuant to a valid choice-of-law provision. (*See* Doc. No. 1.) Though Doe argues that Charlesbank's and Bain's ownership of Varsity Brands "creates an inference" that Charlesbank and Bain "had a vested interest in the profitability of the Enterprise," Doe cites no caselaw to support his proposition that an organization's ownership stake in another subsidiary company constitutes purposeful availment. Indeed, the Sixth Circuit is clear that "a company does not purposefully avail itself merely by owning all or some of a corporation subject to jurisdiction." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1274 (6th Cir. 1998) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n. 13 (1984); *Shaffer v. Heitner*, 433 U.S. 186, 216 (1977); *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir. 1988)). Further, Doe offers no facts to show that Charlesbank or Bain controlled the operation of the Varsity Defendants such that any activities on the part of the Varsity Defendants could be imputed to Charlesbank or Bain—especially since Bain did not invest in the Varsity Defendants until 2018, *two years* after the alleged abuse occurred. *See Roberson v. Waste Man., Inc.*, No. 1:15-CV-00107-GNS, 2016 WL 270458, at *2 (W.D. Ky. Jan. 21, 2016) (citing *Dean*, 134 F.3d at 1274). (Doc. No. 56-1, PageID# 513.)

Likewise, the Court concludes that Doe fails to satisfy the first prong of the specific personal jurisdiction analysis as to Webb. Doe does not allege any facts that suggest that Webb purposely availed himself of the privilege of doing business in Ohio. There is no indication from Doe's Complaint that Webb maintains offices or agents in Ohio, owns property in Ohio, reached into Ohio to solicit, initiate, or transact business, engages (or previously engaged) in significant or long-term business activities within Ohio, or is bound to litigate in Ohio pursuant to a valid choice-of-law provision. (*See* Doc. No. 1.)

21

Additionally, the Court concludes that the fiduciary shield doctrine bars the Court from exercising specific personal jurisdiction over Webb based on his former leadership roles within the Varsity organization.  The Court disagrees with Doe's assertion that *Balance Dynamics* dictates that the Court find it may exercise specific personal jurisdiction over Webb based on his previous leadership positions within the Varsity Defendants' organizations.  (Doc. No. 75, PageID# 783.)  In *Balance Dynamics*, the Sixth Circuit explained that "where an out-of-state agent is **actively and personally involved in the conduct giving rise to the claim**, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice . . . ."  *Balance Dynamics*, 204 F.3d at 698 (emphasis added).  The Sixth Circuit concluded that the district court erred in dismissing two defendants simply because they acted as agents for the corporation and remanded the case for a determination of whether their contacts with the forum state were such that due process permitted exercising personal jurisdiction over them.  *Id.*  Here, Doe does not assert any allegations about Webb that suggest he was "actively and personally involved in the conduct giving rise" to Doe's claims, such that the fiduciary shield doctrine would not apply to Webb.  *Id.*  Instead, most of Doe's allegations about Webb relate to his work in cheerleading in the 1970s and 1980s, including founding the organization that became Varsity Spirit.  (Doc. No. 1, ¶¶ 40-45.)  Otherwise, Doe's allegations relate to the Varsity Defendants generally, not to Webb.  (*See, e.g., id.* at ¶ 48, alleging that "the Varsity Defendants have controlled 80-90% of the market" for all-star cheerleading.)  Further, though Doe alleges that "the Varsity Defendants" control the world of all-star cheer (*Id.* at ¶¶ 89-186), Doe notably does not affirmatively allege that Webb himself controls (or controlled) the Varsity Defendants or all-star cheer.  (*Id.*)

22

Finally, the Court disagrees with Doe that limited jurisdictional discovery is appropriate here. (Doc. No. 75, PageID# 784.)  In *Jane Doe 1, et al. v. Varsity Brands, LLC, et al.*, a group of former all-star cheerleaders brought nearly identical federal and state-law claims against Webb, among other defendants.  *Jane Doe 1, et al. v. Varsity Brands, LLC, et al.*,  No. 6:22-cv-2957, 2023 WL 4191600, at *16 (D.S.C. June 26, 2023).  (*See also* Webb Notice of Supp'l Auth., Doc. No. 107-1.)  The district court concluded that formal jurisdictional discovery was appropriate as to "the extent of Webb's involvement in Varsity's contacts with South Carolina and Foster [a disgraced, former all-star cheerleading coach from South Carolina]."  *Id.*  However, the relevant complaint in *Jane Doe 1* included several allegations absent from this case.  For example, in *Jane Doe 1*, the plaintiffs alleged that Webb "exercised control over all aspects of All-Star cheer, including rulemaking," and "was at the forefront of the conception and execution of the alleged unlawful conspiracy."  *Id.*  The court also noted that "**[j]ust as importantly**, Plaintiffs contend that Webb, through Varsity, has had **significant contacts with South Carolina** and Scott Foster in particular."  *Id.* (emphasis added).  No such allegations exist in this case, nor is there any indication in the Complaint that Webb, through Varsity, had significant contacts with Ohio, or Hale and Davis.  Doe also does not suggest in his Opposition that discovery may reveal ***any*** facts related to any contacts between Webb and Ohio.  Accordingly, the Court declines to exercise its discretion to open limited jurisdictional discovery in this case.

In short, Doe fails to establish through the "traditional" specific personal jurisdiction analysis that this Court should exercise specific personal jurisdiction over Charlesbank, Bain, or Webb.  The only remaining avenue for Doe to establish personal jurisdiction over these defendants is through the nationwide service of process provisions in CAVRA and/or RICO.

23

### 2.      Nationwide Service of Process Pursuant to Federal Statute

Under Fed. R. Civ. P. 4(k)(1)(C), serving a summons or waiver of service will establish personal jurisdiction over a defendant when authorized by federal statute.  Here, there are two federal statutes at issue: (1) CAVRA, 18 U.S.C. § 2255, and (2) RICO, 18 U.S.C. § 1965.

The defendants concede that both statutes allow for nationwide service of process.  (Doc. No. 53-1, PageID# 441; Doc. No. 54-1, PageID# 464; Doc. No. 56-1, PageID# 522.)  However, they nevertheless contend that the Court should not exercise personal jurisdiction under either statute because a plaintiff cannot avail himself of the nationwide service of process provision of a federal statute if the statutory claim fails as a matter of law.  (Doc. No. 53-1, PageID# 441; Doc. No. 54-1, PageID# 464; Doc. No. 56-1, PageID# 522.)

In response, Doe argues that both statutes provide for nationwide service of process.  (Doc. No. 75, PageID# 779; Doc. No. 76, PageID# 820; Doc. No. 77, 856.)  Doe argues that personal jurisdiction can be established when a defendant is validly served in their state of residence, subject only to the Fifth Amendment's due process limitations.  (*Id.*)

On June 28, 2023, Bain and Charlesbank jointly filed a Notice of Supplemental Authority. (Doc. No. 99.)  Bain and Charlesbank appended four opinions from the District of South Carolina, all issued on June 27, 2023.  (*See* Doc. Nos. 99-1, 99-2, 99-3, 99-4.)  Webb filed a similar Notice of Supplemental Authority on July 19, 2023.  (Doc. No. 107.)  He appended four opinions, all issued by the District of South Carolina on June 26, 2023.  (Doc. Nos. 107-1, 107-2, 107-3, 107-4.)  All of these opinions were issued in  cases nearly identical to this one: each involved former minor all-star cheer athletes asserting CAVRA, RICO, and multiple state-law claims against cheerleading gyms, coaches, and all the same corporate defendants as here, including Bain, Charlesbank, and Webb.  (*See, e.g.,*

24

Doc. No. 99-1, *Jane Doe 1, et al. v. Varsity Brands, LLC, et al.*, No. 6:22-cv-2957-HMH, D.S.C. June 27, 2023; Doc. No. 107-1.)  In each opinion, the District of South Carolina concluded that it could exercise personal jurisdiction over Charlesbank, Bain, and Webb because CAVRA, pursuant to 18 U.S.C. § 2255(c)(2), and RICO, pursuant to 18 U.S.C. § 1965(d), provide for nationwide service of process. (Doc. No. 99-1, PageID# 1212-14; Doc. No. 107-1, PageID# 1406-08.) The court concluded that the plaintiffs' claims were at least "colorable" for jurisdictional purposes, and that the defendants had sufficient contacts with the United States as a whole, such that the court's exercise of personal jurisdiction would not violate the Fifth Amendment.  (*Id.*)  The court further concluded that it could exercise pendent claim personal jurisdiction over the plaintiffs' state-law claims against Charlesbank, Bain, and Webb, but noted that its exercise of personal jurisdiction over Doe's state-law claims hinged on the viability of the plaintiffs' CAVRA and RICO claims.  (*Id.*)  Ultimately, the court concluded that the plaintiffs failed to state CAVRA or RICO claims as a matter of law under Fed. R. Civ. P. 12(b)(6) and, therefore, the court declined to exercise pendent claim personal jurisdiction over the state-law claims against Charlesbank, Bain, and Webb.  (Doc. No. 99-1, PageID# 1231; Doc. No. 107-1, PageID# 1424-25.)  The court dismissed the state-law claims against Charlesbank and Bain.[4] (Doc. No. 99-1, PageID# 1231.)

The parties do not analyze § 2255(c)(2) separately from § 1965, but instead address these statutes together.  However, the statutory language in § 2255(c)(2) differs from that in § 1965(b), so the Court will address each statutory basis for personal jurisdiction separately.

---

[4] As discussed above, the District of South Carolina deferred ruling on whether an independent basis for exercising specific personal jurisdiction over Webb existed.  (Doc. No. 107-1, PageID# 1424-25.)  However, in this case, there is no independent basis for exercising specific personal jurisdiction over Webb.  *See supra.*

### a)    18 U.S.C. § 2255(c)(2)

18 U.S.C. § 2255 is titled "Civil remedies for personal injuries" and provides in pertinent part:

(c) Venue; service of process.—

. . .

>   (2) Service of process.—In an action brought under subsection (a), process may be served in any district in which the defendant—

>>   (A) is an inhabitant; or
>>   (B) may be found.

18 U.S.C. § 2255(c)(2).

Courts, including at least one within this circuit, have interpreted § 2255(c)(2) to provide for nationwide service of process. *See, e.g., In re Hotel TVPRA Lit.*, No. 2:22-CV-1924, 2023 WL 3075851, at *7 (S.D. Ohio Apr. 25, 2023); *Doe #1 v. MG Freesites, LTD*, 7:21-cv-00220-LSC, 2022 WL 407147, at *25-26 (N.D. Ala. Feb. 9, 2022); *Doe v. WebGroup Czech Republic, AS*, No. 2:21-cv-02428, 2022 WL 982248, at *8-9 (C.D. Cal. Jan. 13, 2022); *C.T. v. Red Roof Inns, Inc.*, No. 2:19-CV-5384, 2021 WL 2942483, at *7 (S.D. Ohio July 1, 2021) (stating, in dicta, that § 2255 "confers nationwide service of process for minors bringing TVPRA suits" and that "Congress thus has the power to confer nationwide personal jurisdiction when it includes a nationwide service of process provision in a statute") (internal citations omitted). Because § 2255 allows service of process to be served in any district where the defendant is an inhabitant or may be found, a court need only determine whether the defendant has minimum contacts with the United States, rather than a particular forum state. *In re Hotel TVPRA Litig.*, 2023 WL 3075851, at *7 (citing *DeSoto*, 245 F.3d at 567; *Haile v. Henderson Nat'l Bank*, 657 F. 2d 816, 826 (6th Cir. 1981)).

26

"When a motion to dismiss for lack of personal jurisdiction depends on the assertion of a right created by federal statute, the court should dismiss for lack of jurisdiction only if the right claimed is so insubstantial, implausible, foreclosed by prior decisions, or otherwise devoid of merit as not to involve a federal controversy."  *Keidel v. Li*, No. 2:04-CV-270, 2005 WL 8162438, at *4 (S.D. Ohio Feb. 25, 2005) (citing *Panama v. BCCI Holdings*, 119 F.3d 935 (11th Cir. 1997)); *see also Jane Doe 1*, 2023 WL 4209799, at *9.

There is no dispute that Charlesbank, Bain, and Webb have sufficient minimum contacts with the United States.  Additionally, the Court concludes that Doe's § 2255 claim is not so "insubstantial, implausible, foreclosed by prior decisions, or otherwise devoid of merit so as not to involve a federal controversy."  *Keidel*, 2005 WL 8162438, at *4; *see also Jane Doe 1*, 2023 WL 4209799, at *9. However, as in *Jane Doe 1*, the Court emphasizes that its determination as to this threshold issue is distinct from the question of whether Doe's § 2255 claim is plausible under Fed. R. Civ. P. 12(b)(6). *Jane Doe 1*, 2023 WL 4209799, at *9.  Accordingly, the Court concludes that, under § 2255(c)(2), it may exercise personal jurisdiction over Charlesbank, Bain, and Webb as to Doe's CAVRA claim.

### b)      18 U.S.C. § 1965(b)

18 U.S.C. § 1965 of RICO, titled "Venue and Process," provides:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

(c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpoenas

27

issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpoena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965.

The Sixth Circuit recently announced, as a matter of first impression within the circuit, that § 1965(b) governs the exercise of personal jurisdiction over out-of-district RICO defendants. *Peters Broad. Eng'g, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 438 (6th Cir. 2022).  In so holding, the Sixth Circuit joined the Second, Third, Seventh, Ninth, Tenth, and D.C. Circuits in adopting § 1965(b)'s "forum-state" approach. *Id.*  The Sixth Circuit expressly rejected the Fourth and Eleventh Circuits' "national contacts" approach under § 1965(d).[5]  The Sixth Circuit concluded that the "forum-state" approach comported with congressional intent and ensured that no subsection within § 1965 was rendered redundant. *Id.* at 439-40.  The Sixth Circuit's *Peters* decision is notable because it expressly rejected, in the context of RICO cases, the "national contacts" test the District of South Carolina applied in determining that it could exercise personal jurisdiction over the defendants in *Jane Doe 1*. (*See, e.g.,* Doc. No. 99-1, PageID# 1213.)

Thus, under the "forum state" test, when a plaintiff brings a civil RICO action in a district court against at least one defendant with traditional forum state contacts (i.e., the defendant described by § 1965(a) and reached by Rule 4(k)(1)(A)), then nationwide summonses can be served on other

---

[5] The "national contacts" approach mirrors § 2255(c)(2)'s approach: (1) whether a defendant has sufficient minimum contacts with the United States, and (2) whether the plaintiff has stated a colorable claim. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626-27 (4th Cir. 1997).

28

out-of-district defendants if "the ends of justice" so require.  *Peters Broad.*, 40 F.4th at 441-42.  Put another way, a plaintiff must satisfy two requirements to establish personal jurisdiction under § 1965(b): (1) at least one other defendant must have minimum contacts with the forum state, and (2) the "ends of justice" must require that the district court in question is the one in which the matter should be heard.  *Id.* at 441-42.  The Court separately addresses each question.

> **(1)     Does at least one defendant have minimum contacts with Ohio?**

According to the Sixth Circuit, for a defendant to have "minimum contacts" with Ohio, the court requires the following three criteria be met:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* (quoting *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549-50 (6th Cir. 2016)).

The Court concludes that at least two defendants in this case, namely Hale and Davis, have sufficient minimum contacts with Ohio.   First, Hale and Davis purposely availed themselves of the privilege of acting within Ohio when they traveled to northeast Ohio in July 2016 to conduct choreography skills clinics for at least two different all-star cheerleading gyms in the area and stayed overnight in a hotel in Westlake, Ohio.  (Doc. No. 1, ¶¶ 192, 195, 199.)  Second, the cause of action arises from Hale's and Davis's purported activities in Ohio, specifically their alleged sexual abuse of Doe.  (*Id.* at ¶¶ 196-97, 199, 268-70.)   Third, Hale's and Davis's alleged acts have a substantial connection to Ohio because the alleged abuse occurred in Ohio.  (*Id.* at ¶ 14, 195-97.)  Thus, there are at least two defendants with minimum contacts with Ohio.  Accordingly, the only remaining

29

question under the § 1965(b) inquiry is whether the "ends of justice require" that Charlesbank, Bain, and Webb be brought before this Court.

### (2) Do the ends of justice require this Court to hear this matter?

The Sixth Circuit declined to define the term "ends of justice." *Peters Broad.*, 40 F.4th at 440 n.4 ("We need not, and therefore do not, delve into the meaning of § 1965(b)'s 'ends of justice' language because there is no initial defendant that meets the requirements of § 1965(a)."). However, other courts within this district have considered the meaning of the term. *See Rexam Healthcare Packaging, Inc. v. Osiris Med., Inc.*, No. 3:09-CV-1584, 2010 WL 819063, at *5 (N.D. Ohio Mar. 9, 2010).

In *Rexam Healthcare*, another court within this district observed that Circuit courts are split on the meaning of "ends of justice":

> The Ninth Circuit has read the phrase "the ends of justice" in § 1965(b) to mean that "the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986). The Ninth Circuit did not explain why it felt that § 1965(b) required this crabbed and inflexible interpretation, however, and better-reasoned opinions from other courts have reached a contrary conclusion.
>
> In *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006), for example, the Tenth Circuit "disagree[d] with the Ninth Circuit" and "conclude[d] that the 'ends of justice' analysis is not controlled by the fact that all defendants may be amenable to suit in one forum." In so holding, the Tenth Circuit cited persuasive evidence that Congress modeled RICO § 1965(b) on antitrust laws that "prescribe[d] an 'ends of justice' analysis for allowing 'other parties' to be summoned before the court, 'whether they reside in the district in which the court is held or not.'" *Id.* at 1232 (quoting 15 U.S.C. §§ 5 (Sherman Act), 10 (Wilson Tariff Act), & 22 (Clayton Act)). The Tenth Circuit also noted that it would be inconsistent with RICO's purpose of "eradicat[ing] organized crime" to force a RICO plaintiff to litigate in an inconvenient judicial district "whenever organized criminals operate within the same locale and cause harm in a distant state." *Id.* at 1232; *see also Rolls-Royce Corp.*, 576 F. Supp. 2d at 782 (N.D. Tex. 2008) ("The court agrees with the reasoning of *Cory* and declines

30

to follow the Ninth Circuit's restrictive interpretation of § 1965(b)"); *American Trade Partners, L.P. v. A-1 Intern. Importing Enterprises, Ltd.*, 755 F. Supp. 1292, 1305 n.20 (E.D.Pa. 1990) (declining to follow *Butcher's Union* because "[n]owhere in section 1965(b) does it say that there must not be some other appropriate forum.").

*Id.*

The *Rexam* court declined to follow the Ninth Circuit's approach and concluded that the Tenth Circuit set forth the correct standard: that "'the 'ends of justice' is a flexible concept uniquely tailored to the facts of each case.'" *Id.* (quoting *Cory*, 468 F.3d at 1232). In *Rexam*, the court listed several factors that other courts have considered when determining whether the ends of justice require RICO service of process, including: "the desirability of having the whole action litigated in one court[,] the cost of the delay involved in transferring the case to another forum[,] and the general balance of hardships between plaintiff and defendant." *Id.* (cleaned up). The *Rexam* court concluded that these considerations weighed in favor of retaining jurisdiction over all the defendants in the action before it. *Id.* The court reasoned that if it found that § 1965(b) jurisdiction was improper, it would result in the dismissal of only two of the three defendants, which would potentially require the claims to be simultaneously litigated in both Texas and Ohio, potentially causing great expense and inconvenience for both parties. *Id.* Further, the case was already seven months old, no discovery had yet been conducted, and any transfer would result in even more delay as the parties brought new local counsel up to speed on the case. *Id.* Finally, any burdens on the two out-of-district defendants were minimal, as they already had competent local counsel and appeared capable of defending the action in Ohio. *Id.* at *6. As the balance of hardships "clearly favor[ed]" keeping the case in Ohio, the court concluded that the "ends of justice" required that it exercise personal jurisdiction over all the defendants, pursuant to § 1965(b). *Id. See also, e.g., Suarez Corp. Ind. V. McGraw*, 71 F. Supp. 2d

769, 778-79 (N.D. Ohio 1999) (concluding that, in light of Congress's intent that RICO provide a plaintiff with the means of bringing all members of a nationwide RICO conspiracy before the court in a single trial, it would not serve the ends of justice to require separate trials in different fora against parties who both had close involvement in the underlying events and who worked in the same department, even if there was some inconvenience in defending an action in Ohio federal court); *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 23 F. Supp. 2d 796, 803 (N.D. Ohio 1998). Here, the Court will apply the "ends of justice" framework set forth in *Rexam Healthcare*.

In this case, the Court concludes that it is highly desirable to have the entire action litigated in one court. *Rexam Healthcare*, 2010 WL 819063, at *5-6 (citing *Farmers Bank v. Bell Mortg. Corp.*, 577 F. Supp. 34, 35 (D.Del. 1978); *Suarez Corp.*, 71 F. Supp. 2d at 778)). There are eleven different defendants involved in this matter. (*See* Doc. No. 1.) Doe's claims against Charlesbank, Bain, and Webb are identical to the claims that he asserts against several other combinations of defendants. (*Id.*) Requiring the plaintiff to file multiple identical actions against Charlesbank and Bain, who maintain their principal places of business in Massachusetts, and Webb, a citizen of Tennessee, in addition to maintaining the instant action, does not serve the ends of justice. (Doc. No. 1, ¶¶ 18, 26, 27.) Rather, it would cause significant delay, redundancy, and expense for multiple parties.

Additionally, declining to exercise personal jurisdiction would further delay resolution of this case. This action has been pending in this Court for eight months, and no discovery has yet occurred, while the parties await this Court's decisions on the myriad motions to dismiss. (*See* Doc. No. 1.) If this Court dismissed Charlesbank, Bain, and Webb, these defendants (and Doe) would find themselves back at square one should Doe decide to refile separate actions against these defendants

in their home districts.  The Court assumes that, if Doe refiled his Complaint, the defendants would refile identical Rule 12(b)(6) motions, thus placing the parties in the same posture as they find themselves in now.  Rather than further delaying resolution of this matter, the Court believes it serves the ends of justice to address Doe's claims against Charlesbank, Bain, and Webb as part and parcel of the Court's resolution of *all* the motions to dismiss Doe's various claims.

Finally, the general balance of hardships between Doe and Charlesbank, Bain, and Webb weighs in favor of keeping this case in Ohio.  The burden on Charlesbank, Bain, and Webb to litigate in Ohio is minimal.  These parties have retained competent local counsel and can easily conduct most of their litigation via electronic means.  *See Rexam Healthcare*, 2010 WL 819063, at *5-6.

Accordingly, the Court finds that "the ends of justice require" exercising personal jurisdiction over Charlesbank, Bain, and Webb as to Doe's RICO claim, pursuant to RICO's nationwide service of process provision, § 1965(b).

### 3.    Pendent Claim Personal Jurisdiction

Pendent claim personal jurisdiction "is a common law doctrine that recognizes the inherent fairness of exercising personal jurisdiction over claims asserted against a Defendant over whom the Court already has personal jurisdiction with respect to another claim or claims arising out of the same nucleus of operative facts."  *J.M. Smucker Co. v. Promotion in Motion, Inc.*, 420 F. Supp. 3d 646, 658 (N.D. Ohio 2019) (internal quotation omitted).  Several Circuit courts of appeals, as well as district courts, have adopted this doctrine.  *Id.*; *see also Wiggins v. Bank of Am.*, 488 F. Supp. 3d 611, 624 (S.D. Ohio 2020).  The Sixth Circuit, however, is not one of them.

In *Canaday v. Anthem Co., Inc.*, the Sixth Circuit observed that it "has never recognized" pendent claim personal jurisdiction before, and further declined to recognize the doctrine at that

time—although the court stopped short of holding that pendent claim personal jurisdiction did not exist within the Sixth Circuit.[6]  9 F.4th 392, 401 (6th Cir. 2021).  The Sixth Circuit observed that when other courts *had* recognized pendent claim personal jurisdiction, it was, as is the case here, "usually because the underlying federal statute . . . authorized nationwide service of process and the plaintiff filed claims related to the federal anchor claim."  *Id.* (citations omitted).  However, the Sixth Circuit also observed that "no federal statute or rule authorizes pendent . . . claim personal jurisdiction," and that "[n]o such law exists—not in 28 U.S.C. § 1367, the supplemental jurisdiction statute, not in the Federal Rules of Civil Procedure."  *Id.* at 401-02.

None of the parties address the *Canaday* court's apparent skepticism of pendent claim personal jurisdiction, nor discuss the issue of pendent claim personal jurisdiction in detail.  However, even if the Court *can* exercise pendent claim personal jurisdiction over Doe's state-law claims, it may only do so if Doe's federal "anchor" claims are viable.  *Id.*; *see also Doe 1*, 2023 WL 4209799, at *10.  Accordingly, the Court now turns to Charlesbank's, Bain's, and Webb's Rule 12(b)(6) challenges to Doe's CAVRA and RICO claims.

### B.    Count 1, 18 U.S.C. § 2255

In Count 1, Doe brings a claim under 18 U.S.C. § 2255 against all Defendants, including Bain, Charlesbank, and Webb.  18 U.S.C. § 2255 was enacted as part of the Child Abuse Victims' Rights Act of 1986 ("CAVRA") and "empowers victims of child sexual abuse to recover money for the harms caused by their abusers."  *Prewett v. Weems*, 749 F.3d 454, 457 (6th Cir. 2014).

The statute reads, in relevant part, as follows:

(a) In general.—Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422,

---

[6] *Canaday* involved a proposed collective action under the Federal Labor Standards Act.  9 F.4th at 394.  Unlike CAVRA and RICO, the FLSA does not provide for nationwide service of process.  *Id.* at 401.

or 2423 of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2255(a).

Under § 2255, a plaintiff "must establish a liability predicate for the award and a damages predicate for the award." *Prewett*, 749 F.3d at 457. "As for liability, the victim must show that his abuser violated a qualifying criminal statute." *Id.* As discussed below, Doe alleges that he was a victim of abuse in contravention of § 2422, one of the qualifying criminal statutes enumerated in § 2255(a). *See infra*. Section 2422 provides, in relevant part, as follows:

> **(a)** Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

> **(b)** Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422.

No criminal conviction is necessary to recover damages under § 2255. *Prewett*, 749 F.3d at 458. Rather, a plaintiff need only show, by a preponderance of the evidence, that a defendant committed one of the enumerated offenses. *Id.*

Doe alleges that the specific abusive acts were performed by "Defendants Hale, Davis, and ShowPro against Plaintiff John Doe 1 and enabled by the ongoing certification and ratification of the

Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital." (Doc. No. 1, ¶ 253.)  Doe alleges that Hale, Davis, and ShowPro qualify as covered individuals under the statute and that the facts of this case indicate that the abuse occurred at "events," as defined by the statute.  (*Id.* at ¶ 256.)  Doe further alleges that Hale, Davis, and ShowPro "were held out by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital as being members and part of a safe network of coaches, choreographers, vendors, and other affiliates." (*Id.* at ¶ 257.)  Doe alleges that he "was a minor at the time he was sexually abused and assaulted in contravention of 18 U.S.C. § 2422, thus constituting violations of 18 U.S.C. § 2255," and that he has suffered personal injuries because of these violations of law.  (*Id.* at ¶¶ 258-59.)  Notably, though Doe asserts this claim against all Defendants, Doe does not name Webb as one of the defendants responsible for certifying and/or ratifying Hale's and Davis's conduct in Count 1.  (*Id.* at ¶¶ 253, 257.)  Indeed, Doe does not list Webb's name in any of the paragraphs under Count 1.  (*Id.* at ¶¶ 252-60.)

Webb and Bain contend that Doe's § 2255 claim should be dismissed because Doe does not allege that either party committed a predicate violation of § 2255.  (Doc. No. 54-1, PageID# 467; Doc. No. 56-1, PageID# 524.)  Charlesbank, Webb, and Bain further argue that § 2255 does not provide for secondary or vicarious liability, and, at any rate, that Doe does not plausibly allege such liability.  (Doc. No. 53-1, PageID# 425; Doc. No. 54-1, PageID# 468; Doc. No. 56-1, PageID# 525.)

In his Oppositions, Doe argues that "numerous courts" have determined that a party may be criminally liable under § 2422 "for aiding and abetting." (Doc. No. 75, PageID# 789; Doc. No. 76, PageID# 825; Doc. No. 77, PageID# 861.)  Doe argues that Webb's creation of USASF and use of safety certification as a marketing tool "placed certified individuals" in positions of trust and

36

authorized them to obtain access to children in the Varsity network.  (Doc. No. 75, PageID# 789.)
Doe further argues that, during a time in which Bain owned the Varsity Defendants, "Defendants"
failed to properly investigate allegations of abuse and that "Defendants" empowered ShowPro, Hale,
and Davis, "despite specific knowledge that" these individuals posed a serious risk of harm to
children.  (Doc. No. 77, PageID# 861-62.)  As to Charlesbank, Doe argues that Varsity Spirit, which
was "owed[ ] and funded" by Charlesbank, authorized Hale and Davis to access minor children within
the Varsity network.  (Doc. No. 76, PageID# 826.)

For the following reasons, the Court concludes that Doe fails to state a claim under § 2255
against Charlesbank, Bain, and Webb.  First, Doe's § 2255 claim fails because he has not pleaded
any specific facts suggesting that Charlesbank, Bain, and/or Webb themselves committed any of the
predicate offenses alleged in the Complaint.  Indeed, in Doe's Complaint, he alleges that "the specific
acts complained of [were] performed by Defendants Hale, Davis, and ShowPro against" him, and that
Charlesbank and Bain, among others, "enabled" these acts through "ongoing certification and
ratification . . . ."  (Doc. No. 1, ¶ 253.)  Further, as noted above, Doe does not allege that Webb
enabled, certified, or ratified Hale's and Davis's alleged acts in any way.  *See supra.*  Thus, Doe
plainly does not allege that Charlesbank, Bain, or Webb themselves violated § 2422 (or any of the
other enumerated statutes in § 2255).

Further, to the extent Doe attempts to hold Charlesbank, Bain, or Webb secondarily liable
under an aiding-and-abetting theory, this attempt fails because § 2255 does not provide for secondary
liability.  *See Jane Doe 1, et al. v. Varsity Brands, LLC, et al.*, No. 6:22-cv-2957, 2023 WL 4088483,
at *7 (D.S.C. June 20, 2023).  In interpreting a statute,

> the Court determines and gives effect to the intent of Congress as expressed in the
> statute it enacted. *See, e.g., Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 253 (6th Cir.

37

2020) (citations omitted). The Court begins "where all such inquires must begin: with the text of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985)). **Where the statute's language is plain, the inquiry also ends with the text.** *Id.* Courts "endeavor to 'read statutes with an eye to their straightforward and commonsense meanings.'" *Black v. Pension Benefit Guar. Corp.*, 983 F.3d 858, 863 (6th Cir. 2020) (quoting *Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 285 (6th Cir. 2010)). In doing so, courts ascribe "terms the ordinary meaning that they carried when the statute was enacted." *Id.* (citation and quotation omitted).

*Skyworks, Ltd. v. Centers for Disease Control and Prevention*, 524 F. Supp. 3d 745, 756-57 (N.D. Ohio 2021) (emphasis added).  Section 2255 does not mention, or provide for, secondary liability. *See* 18 U.S.C. § 2255.  This absence alone indicates that Congress did not intend to permit secondary liability under § 2255.  *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 689 (7th Cir. 2008) (en banc) ("[S]tatutory silence on the subject of secondary liability means there is none . . . ."); *see also Doe v. City of Gauley Bridge*, No. 2:21-cv-00491, 2022 WL 3587827, at *13 (S.D. W. Va. Aug. 22, 2022).

Recently, in *Jane Doe 1, et al. v. Varsity Brands, LLC, et al.*, the District of South Carolina likewise concluded that the plain language of § 2255 did not provide for secondary liability against Webb, Charlesbank, and Bain.  *Jane Doe 1, et al. v. Varsity Brands, LLC, et al.*, No. 6:22-cv-2957, 2023 WL 4191600, at *9 (D.S.C. June 26, 2023) (as to Webb); *Jane Doe 1, et al. v. Varsity Brands, LLC, et al.*, No. 6:22-cv-2957, 2023 WL 4209799, at *11 (D.S.C. June 27, 2023) (as to Charlesbank and Bain).[7]  In *Jane Doe 1*, as in this case, nine former all-star cheerleaders alleged that they were sexually abused by various adults affiliated with the all-star cheerleading community.  *Jane Doe 1*, 2023 WL 4191600, at *1.  The plaintiffs in *Jane Doe 1* alleged that the perpetrators' acts of abuse

---

[7] Though the District of South Carolina issued two separate opinions, one as to Webb's Motion and the other as to Charlesbank's and Bain's Motions, the court's analysis regarding the substance of the § 2255 claim is nearly identical between the two.

were "enabled by the ongoing certification and ratification" of the Varsity Defendants, USA Cheer, USASF, Charlesbank, and Bain, and that the perpetrators were held out as "part of a network of safe and trustworthy cheer coaching gyms." *Id.* at *8. The *Jane Doe 1* court concluded that, to the extent the plaintiffs attempted to hold the defendants secondarily liable under an aiding-and-abetting theory, a plain reading of § 2255 and Supreme Court case law foreclosed such an argument. *Id.* at *9. The court further concluded that, to the extent a few courts have read secondary liability into § 2255, those courts "overlooked the Supreme Court's decision in *Central Bank, N.A. v. First Interstate Bank, N.A.*" *Id.* at *8.

In *Central Bank*, the Supreme Court reasoned, in the context of interpreting the Securities and Exchange Act of 1934, that "Congress kn[ows] how to impose aiding and abetting liability when it cho[oses] to do so. If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Central Bank*, 511 U.S. at 176-77. The Supreme Court further explained that because "Congress has not enacted a general civil aiding and abetting statute, there is no general presumption that [a] plaintiff may also sue aiders and abettors when Congress creates a private cause of action," and thus, when a person sues to recover damages from a private defendant for the defendant's violation of a statute, "there is no general presumption that the plaintiff may also sue aiders and abettors." *Id.* at 182.

The *Jane Doe 1* court observed that "*Central Bank*'s rationale is not limited to the context of federal securities laws, as 'nothing in its holding turns on particular features of those laws.'" *Jane Doe* 1, 2023 WL 4088483, at *9 (quoting *Boim*, 549 F.3d at 689; citing *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 277-78 (D.C. Cir. 2018) and *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006 & n.1 (9th Cir. 2006)). Indeed, district courts within this circuit have also applied *Central Bank*'s reasoning

in multiple unpublished opinions that there is no presumption in favor of recognizing civil aiding and abetting liability in the absence of statutory authorization outside the context of securities cases.  *See, e.g.*, *HLV, LLC v. Cnty. of Van Buren*, No. 1:13-cv-1366, 2015 WL 13873105, at *7-8 (W.D. Mich. June 29, 2015); *HMV Props., LLC v. IDC Ohio Man., LLC*, No. 2:08-cv-895, 2011 WL 53166, at *14 (S.D. Ohio Jan. 6, 2011); *Wuliger v. Liberty Bank, N.A.*, No. 3:02-cv-1378, 2004 WL 3377416, at *10 (N.D. Ohio Mar. 4, 2004).  Thus, the Court declines to read secondary liability into § 2255.  *Jane Doe 1*, 2023 WL 4088483, at *10.

Doe's argument that "[n]umerous Circuits and district courts have determined that a party may be **criminally** liable under section 2422 for aiding and abetting" is unpersuasive.  (Doc. No. 75, PageID# 789, emphasis added; *see also* Doc. No. 76, PageID# 825; Doc. No. 77, PageID# 861.)  As the D.C. Circuit noted in *Owens v. BNP Paribas, S.A.*, the "presumption against the inclusion of aiding and abetting liability rests partially on the fact that 'Congress has not enacted a general **civil** aiding and abetting statute,' . . . akin to the general **criminal** aiding and abetting statute, *see* 18 U.S.C. § 2(a)."  *Owens*, 897 F.3d at 277 (quoting *Central Bank*, 511 U.S. at 182) (cleaned up) (emphasis added).  Here, Doe claims that the defendants are civilly, not criminally, liable under § 2255.

Likewise, Doe's citation to *Jane Doe No. 8 v. Royal Caribbean Cruises, Ltd.* for the proposition that § 2255 does not limit liability to the first party perpetrator is not persuasive.  (Doc. No. 75, PageID# 788, emphasis added; *see also* Doc. No. 76, PageID# 825; Doc. No. 77, PageID# 860.)  In *Jane Doe No. 8*, the plaintiff brought two claims against a defendant cruise line after one of the cruise line's employees sexually assaulted the plaintiff when she was a 17-year-old passenger on one of its ships.  *Jane Doe No. 8 v. Royal Caribbean Cruises, Ltd.*, 860 F. Supp. 2d 1337, 1338 (S.D. Fla.).  The defendant cruise line argued that the plaintiff's § 2255 claims against the cruise line should

40

be dismissed because § 2255 provided a cause of action only against the criminal offender, i.e., the cruise line's employee. *Id.* at 1339. In conducting its statutory analysis of § 2255, the court noted that particularly relevant to its analysis of § 2255 was the "well-established canon of construction that '[s]tatutes which invade the common law or the general maritime law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evidence.'" *Id.* at 1339 (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). The court noted that "[s]quarely applicable to this case is the principle of federal maritime law that a cruise line is strictly liable for a crew member's assault of a passenger," a principle clearly established by two Supreme Court decisions from the late 19th century that remained binding precedent. *Id.* The *Jane Doe 8* court reasoned that it "must presume Congress intended to incorporate this long-standing principle of federal maritime law when enacting § 2255." *Id.* at 1340. However, the instant case does not involve maritime law. Thus, the *Jane Doe 8* court's approach to statutory interpretation of § 2255 is inapposite.

Accordingly, the Court concludes that Doe fails to state a § 2255 claim against Charlesbank, Bain, or Webb. Count 1 is dismissed.

**C.    Count 2, Violations of the RICO Act, Pursuant to 18 U.S.C. §§ 1962(c) and (d)**

In Count 2, Doe alleges that all Defendants, including Charlesbank, Bain, and Webb, committed civil conspiracy in violation of the RICO Act, pursuant to 18 U.S.C. §§ 1962(c) and (d). (Doc. No. 1, ¶¶ 261-84.) 18 U.S.C. § 1964(c) provides a civil cause of action for any "person injured in his business or property by reason of a violation of section 1962 of this chapter . . . ." Doe alleges that all Defendants violated § 1962(c) and (d). (*Id.*) Section 1962(c) provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful

41

debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1962(c). Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).

A substantive RICO claim brought under § 1962(c) has four elements: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Courser v. Allard*, 969 F.3d 604, 621 (6th Cir. 2020) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).  A RICO plaintiff must also establish that he suffered an injury to "business or property" because of the defendant's unlawful conduct.  *Jackson v. Sedgwick Claims Man. Servs., Inc.*, 731 F.3d 556, 563-64 (6th Cir. 2013).  Section 1962(d) makes it "unlawful for any person to conspire to violate any of" § 1962's provisions, including § 1962(c).

Charlesbank, Bain, and Webb challenge essentially all aspects of Doe's § 1962(c) and (d) RICO claims.  For the following reasons, the Court concludes that Doe fails to plausibly allege claims under either § 1962(c) or (d).

### 1.    Doe Fails to Allege RICO standing

RICO's standing requirement has two elements: (1) injury to business or property; and (2) causation.  *Jackson*, 731 F.3d at 563-64; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). *See also Saro v. Brown*, 11 Fed. App'x 387, 389 (6th Cir. 2001).  An "injury to business or property" under RICO excludes "personal injuries" and also those injuries flowing therefrom.  *See Jackson*, 731 F.3d at 563-64.  Moreover, "[t]he injury to business or property must be concrete," rather than speculative or intangible.  *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 699 (E.D. Mich. 2020) (citing *Saro*, 11 F. App'x at 389) (internal quotations omitted).  Doe claims that he suffered two injuries

42

sufficient to convey RICO standing.  First, he claims that he was injured because he "had a property interest in his membership dues . . . and other fees and costs . . . ."  (Doc. No. 1, ¶ 281.)  Second, he claims that he had a property interest in the "continued ability to cheer competitively."  (*Id.*)

### a)      Loss of Ability to Cheer Competitively

The Court begins with Doe's second alleged injury, that Doe had a property interest in the "continued ability to cheer competitively," which would have allowed Doe to gain "social media notoriety, 'Cheerlebrity' status, scholarship opportunities," and even possibly to become a cheer coach, gym owner, and/or event promoter himself.  (Doc. No. 1, ¶ 281.)  The Court rejects this argument.  First, this is too speculative of an injury to support RICO standing.  *See Raymo*, 475 F. Supp. 3d at 699.  In *Doe 1*, the District of South Carolina considered, and rejected, the identical argument that the plaintiffs' loss of their continued ability to cheer competitively was a sufficient injury to confer RICO standing.  *Doe 1*, 2023 WL 4191600, at *10-11.  The *Doe 1* court reasoned that the "[p]laintiffs had, at best, mere expectancy interests in realizing future financial and business opportunities in which [they] and their famil[ies] invested."  *Id.* (internal quotations omitted) (citing *Bowen v. Adidas Am., Inc.*, 541 F. Supp. 3d 670, 679-80 (D.S.C. 2021) (holding college basketball player did not have a recoverable expectancy interest in potential lost earnings he hoped to obtain as a potential first-round NBA draft pick)).  Likewise, here, a hoped-for career in all-star cheerleading is too speculative to comprise a protected property right under RICO.

Second, even if the loss of a potential career in all-star cheerleading was a concrete injury, such an injury could not confer RICO standing as Doe's loss of his alleged potential continued ability to cheer is derivative of his personal injury.  In other words, Doe's loss of his continued ability to cheer stems directly from any personal injuries Doe suffered as the result of Hale's and Davis's

43

alleged sexual abuse. *Jackson*, 731 F.3d at 565-66; *see also Gucwa v. Lawley*, 731 F. App'x 408, 412 (6th Cir. 2018) ("Even though personal injuries may lead to monetary damages, such personal injuries and their associated pecuniary losses—including medical expenses—do not confer relief under § 1964(c)."). Thus, the Court concludes that Doe fails to sufficiently allege RICO standing based on his alleged loss of his ability to compete in competitive cheerleading.

### b) Membership Dues and Fees

Doe also contends that he had a property interest in his membership dues and fees remitted to the Defendants. (Doc. No. 1, ¶ 281.) "Money, of course, is a form of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979).

Charlesbank, by reference,[8] Webb, and Bain argue that Doe's alleged monetary losses are not redressable under RICO because they derive from his personal injury claim, i.e., the alleged sexual abuse perpetrated against Doe by Davis and Hale. (Doc. No. 53-1, PageID# 426; Doc. No. 54-1, PageID# 472; Doc. No. 56-1, PageID# 527.) However, this argument is unavailing because Doe paid his dues and fees to Defendants *before* Davis and Hale allegedly assaulted him. *Doe 1*, 2023 WL 4191600, at *11. Logically, then, the dues and fees Doe paid to the defendants could not derive from his non-compensable personal injuries, so as not to be compensable under RICO. *Id.*

However, Charlesbank, Webb, and Bain also argue that Doe fails to plead the requisite proximate cause between Defendants' alleged conduct and Doe's injury to support any RICO claims. (Doc. No. 53-1, PageID# 426; Doc. No. 54-1, PageID# 472-73; Doc. No. 56-1, PageID# 528.) "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not

---

[8] Charlesbank adopted by reference all of the arguments that Varsity Spirit asserted in § II of its Motion. (Doc. No. 53, PageID# 426.) Charlesbank contends that the "RICO claims against Charlesbank fail for the same reasons that the claims fail against Varsity Spirit." (*Id.*)

only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led ***directly*** to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added).

Here, Doe fails to plausibly allege that Charlesbank, Bain, or Webb made any misrepresentations about athlete safety in the first place, let alone that any such purported misrepresentations about athlete safety led **directly** to Doe paying his membership dues, fees, and other incidental costs to them.  Doe's only allegation as to proximate cause in the RICO context is that "[t]he actions of the Enterprise and its conspirators were the direct and proximate cause of these injuries to the Plaintiff."  (Doc. No. 1, ¶ 282.)  This is no more than a threadbare recital of one of the elements of a civil RICO claim.  *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Doe's allegations elsewhere in his Complaint belie his claim that he paid his dues and fees because of Defendants' representations about safety.  Rather, Doe alleges that he paid his membership dues, fees, and other incidental expenses to Defendants because he was required to do so to participate in Varsity-sponsored competitions and events.  (Doc. No. 1, ¶ 25.)  For example, Doe alleges that " . . . Defendant Webb mandated that All-star athletes cheering on behalf of Varsity-affiliated gyms purchase a USASF membership **as a requirement to compete at Varsity-sponsored events**."  (*Id.* at ¶ 56, emphasis added.)  Doe also alleges that "[a]ll-star athletes competing on behalf of Varsity-member gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants **for music, training, competition attendance, accessories, and other related fees**."  (*Id.* at ¶ 61,

45

emphasis added.)  Thus, based on the face of his Complaint, Doe paid membership fees, dues, and other incidental costs because he wished to participate in competitive all-star cheerleading, not because of Defendants' alleged misrepresentations about safety.  Accordingly, having failed to allege that he was injured because of Charlesbank's, Bain's, and Webb's purported predicate acts, Doe fails to state a civil RICO claim based on membership dues, fees, and/or other incidental costs.  *See also, e.g., Gilbert v. U.S. Olympic Comm.*, No. 18-cv-00981-CMA-MEH, 2019 WL 1058194, at *25, *report and recommendation adopted in relevant part by* 423 F. Supp. 3d 1112 (D. Colo. 2019) (rejecting former national taekwondo athletes' argument that they had civil RICO standing based, in part, on the $50 annual membership fee they paid to USA Taekwondo because the athletes paid their fees to engage in USAT events, not because of the defendants' predicate acts).

### 2.    Doe Fails to Allege a RICO "Association-in-Fact" Enterprise

Even if Doe could establish RICO standing, his § 1962(c) claim would nevertheless fail because he does not sufficiently allege the existence of a RICO "association-in-fact" enterprise.

A RICO association-in-fact enterprise "includes any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  In *Boyle v. U.S.*, the Supreme Court described the characteristics of such an enterprise:

> Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

46

*Boyle v. U.S.*, 556 U.S. 938, 948 (2009). Thus, an association-in-fact enterprise "has at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

Here, Doe alleges that all Defendants formed an association-in-fact enterprise. (Doc. No. 1, ¶ 267.) Doe alleges that each defendant "operated as a single unified entity with the common goal of taking billions of dollars from minor athletes who wanted to be a part of the competitive cheer world Defendants oversee, as well as to perpetuate a pipeline of new child-athletes, coaches and gyms." (*Id.* at ¶ 239.) Doe alleges that each defendant participated in the operation and management of the enterprise. (*Id.* at ¶ 241.) Doe further alleges that the enterprise "consists of a group of persons associated together for the common purpose of recklessly, intentionally, and willfully endangering the Plaintiff as a minor athlete by exposing him to illegal sexual abuse and exploitation of children while continuously and repeatedly taking money from Plaintiff, and also assuring his parents and/or guardians he was particularly safe in order to take this money." (*Id.* at ¶ 270.) Charlesbank, through reference, Webb, and Bain argue that Doe fails to allege a common purpose among the alleged enterprise participants. (Doc. No. 53-1, PageID# 426; Doc. No. 54-1, PageID# 474; Doc. No. 56-1, PageID# 529.) Notably, Webb asserts that Doe does not allege that Webb formed any association-in-fact or otherwise participated in the alleged enterprise. (Doc. No. 54-1, PageID# 474.)

The Court concludes that Doe fails to plead any non-conclusory allegations that Defendants shared the common purpose of exposing Doe to sexual abuse while repeatedly taking his money. *Boyle*, 556 U.S. at 946. While Doe's Complaint contains myriad allegations about Charlesbank's, Bain's, and Webb's business goals and purposes, Doe's Complaint contains no factual allegations that Charlesbank, Bain, and Webb aimed to expose Doe to sexual abuse, or that these defendants

shared a purpose with the alleged perpetrators of exposing Doe to such abuse. (*See* Doc. No. 1.) Doe's allegations regarding the specific acts of abuse relate only to actions allegedly taken by Hale and Davis. (*Id.* at ¶¶ 187-219.) Doe's allegations that Charlesbank and Bain shared in a "common purpose" to sexually abuse Doe are conclusory and do not rise above the level of mere speculation. *Bassett*, 528 F.3d at 430 (citing *Twombly*, 550 U.S. at 555-56).

Additionally, Doe does not allege that Webb himself was part of this enterprise, or that he shared a "common purpose" to sexually abuse Doe. (*See* Doc. No. 1, ¶¶ 235-50, 261-84.) Doe appears to assert in his Opposition to Webb's Motion that the Court may interpret Doe's allegations as to the membership of the RICO enterprise to include Webb because Webb "was considered by all to have utter control over Allstar competitive cheer." (Doc. No. 75, PageID# 795.) The Court agrees with Webb that Doe plainly does not allege that Webb was a member of any RICO enterprise. (Doc. No. 85, PageID# 1003.) Further, even if the Court credited Doe's strained interpretation of the Complaint to include Webb in the purported enterprise, the allegations as to the common purpose of the enterprise remain conclusory, as discussed above.

Doe also fails to address the Defendants' arguments that Doe fails to plausibly allege a common purpose to establish the existence of a RICO "association-in-fact" enterprise. Though Doe's Oppositions include sections titled "Plaintiff has alleged facts plausibly establishing a RICO 'association-in-fact' enterprise with a common purpose," Doe does not address Defendants' arguments that he failed to plausibly allege a common purpose among *all* members of the enterprise. (*See* Doc. No. 76, PageID# 828; Doc. No. 77, PageID# 864.) Nor does Doe attempt to direct the Court's attention to any paragraph(s) within the Complaint that set forth sufficient allegations regarding the enterprise's common purpose.

48

Accordingly, the Court concludes that Doe fails to allege the existence of a RICO "association-in-fact" enterprise.  Doe's § 1962(c) claim fails.

### 3.     Doe Fails to Allege RICO Conspiracy Claim

Because Doe's § 1962(c) RICO claim fails for the reasons set forth above, Doe's RICO § 1962(d) claim likewise fails.  Without a viable § 1962(c) claim, Doe's conspiracy claim under § 1962(d) necessarily fails.  *See* 18 U.S.C. § 1962(d); *see also, e.g., Aces High Coal Sales, Inc. v. Cmnty Bank & Tr. W. Ga.*, 768 Fed. App'x 446, 450 (6th Cir. 2019) ("Because plaintiffs failed to plausibly allege a violation of § 1962(b) or (c), the district court properly dismissed the RICO conspiracy claim as well."); *see Marinac v. Todd*, No. 1:20-cv-1571, 2022 WL 3904049, at *14 (N.D. Ohio Aug. 30, 2022) ("[B]ecause plaintiffs have failed to successfully allege all the elements of a substantive RICO violation, plaintiffs have necessarily failed to plausibly allege a RICO-conspiracy claim.").  Accordingly, Doe's RICO claim is dismissed in its entirety.

### D.     Remaining State Law Claims

Because the Court has dismissed Doe's two federal claims against Charlesbank, Bain, and Webb, Doe has no remaining viable federal "anchor" claims.[9]

The Court declines to exercise pendent claim personal jurisdiction over the remaining state-law claims against Charlesbank, Bain, and Webb.  *See, e.g., U.S. v. Botefuhr*, 309 F.3d 1263, 1273-74 (10th Cir. 2002) (concluding district court abused its discretion by retaining jurisdiction over remaining claims after dismissing the anchor claim); *cf. J.M. Smucker Co.*, 420 F. Supp. 3d at 659

---

[9] As discussed *supra*, the Court may not exercise specific personal jurisdiction over Charlesbank, Bain, and Webb as to Doe's state-law claims because there is no basis for doing so under the traditional personal jurisdiction analysis.  *See* Section IV.A.1.  However, even if the Court *could* exercise specific personal jurisdiction over Charlesbank, Bain, and Webb, the Court would nonetheless decline to exercise supplemental *subject-matter* jurisdiction over Doe's state-law claims against Charlesbank, Bain, and Webb for the reasons set forth in Section IV.C. of the Court's opinion as to the Varsity Defendants, USASF, and USA Cheer.

49

(exercising pendent claim personal jurisdiction over a declaratory judgment claim where the claim arose out of the same nucleus of fact as an ongoing federal claim).  Accordingly, Doe's remaining state-law claims against Charlesbank, Bain, and Webb are dismissed.

**V.      Conclusion**

For the reasons set forth above, Charlesbank's, Bain's, and Webb's Motions to Dismiss (Doc. Nos. 53, 54, and 56) are GRANTED.

**IT IS SO ORDERED.**

                         *s/Pamela A. Barker*
                         PAMELA A. BARKER
Date:  August 2, 2023              U. S. DISTRICT JUDGE